## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**MARK T. CAMBRE**                                    **CIVIL ACTION**

**VERSUS**                                                  **NO. 22-211**

**TIM HOOPER**                                    **SECTION: "D"(1)**

### SUPPLEMENTAL REPORT AND RECOMMENDATION

Petitioner, Mark T. Cambre, a Louisiana state prisoner, filed this federal application

seeking habeas corpus relief pursuant to 28 U.S.C. § 2254.  On March 28, 2023, the undersigned

issued a report recommending that the application be dismissed with prejudice on the merits.[1]

Petitioner filed objections.[2]  In part, he argued:

> First and foremost, Cambre objects to the Report and Recommendation in
> its entirety as it is mistakenly crafted without the use of Cambre's well crafted and
> argued reply to the State's response.  Magistrate van Meerveld states, "At
> petitioner's request, he was granted until August 29, 2022, to file a reply to the
> state's response, but no reply was ever filed." (R&R, p. 2).
>      Cambre's (27 page) *Traverse and Reply to State's Response in Opposition
> to Granting Writ of Habeas Corpus*, containing his well crafted arguments with
> supporting jurisprudence, was scanned by the Legal Programs Department at LSP
> and Emailed to the United States District Court for the Eastern District of Louisiana
> on August 25, 2022, four days before it was due.  (Exhibit - A).
>      Cambre submits that the court should remand the matter back to Magistrate
> van Meerveld for crafting a full and fair Report and Recommendation after
> reviewing Cambre's well crafted arguments with supporting jurisprudence that was
> submitted in his reply to the state's response.[3]

Considering the objections, the United States District Judge issued an Order stating, in

pertinent part:

> Although it appears that Cambre's Traverse and Reply was scanned by the Legal
> Programs Department at LSP, the Reply was never filed into the record in this case.

---

[1] Rec. Doc. 19.
[2] Rec. Doc. 22.
[3] Id. at p. 2.

Accordingly, the Magistrate Judge did not have the opportunity to consider the arguments raised by Cambre in his Reply.

Accordingly,

**IT IS HEREBY ORDERED** that this matter is **REMANDED** back to the Magistrate Judge for further consideration in light of the arguments raised by Cambre in his Reply memorandum.[4]

Having now reviewed petitioner's Traverse and Reply to State's Response in Opposition to Granting Writ of Habeas Corpus,[5] the undersigned once again recommends that his federal application seeking habeas corpus relief be **DISMISSED WITH PREJUDICE.**

## I.  History of the State Court Proceedings

On March 12, 2005, petitioner was convicted of first degree murder under Louisiana law,[6] and he was sentenced to a term of life imprisonment without probation, parole, or suspension of sentence on May 6, 2005.[7]  The Louisiana Fifth Circuit Court of Appeal affirmed his conviction and sentence on July 25, 2006,[8] and the Louisiana Supreme Court then denied his related writ application on April 20, 2007.[9]

Petitioner thereafter filed an application for post-conviction relief with the state district court.[10]  Although the district court denied that application in rulings dated June 5 and September 17, 2008,[11] the Louisiana Fifth Circuit Court of Appeal vacated those rulings and remanded the matter for further proceedings.[12]  After petitioner then filed a supplemental post-conviction

---

[4] Rec. Doc. 23.

[5] Rec. Doc. 22-1.

[6] State Rec., Vol. 24 of 72, transcript of March 12, 2005, p. 197; State Rec., Vol. 1 of 72, minute entry dated March 12, 2005; State Rec., Vol. 1 of 72, jury verdict form.  This trial was held after petitioner's first trial ended in a mistrial due to the unexpected death of petitioner's brother.  See State Rec., Vol. 1 of 72, minute entry dated August 18, 2004.

[7] State v. Cambre, No. 03-4506, 2005 WL 5949919 (La. Dist. Ct. May 6, 2005); State Rec., Vol. 25 of 72, transcript of May 6, 2005, p. 15; State Rec., Vol. 1 of 72, minute entry dated May 6, 2005.

[8] State v. Cambre, 939 So. 2d 446 (La. App. 5th Cir. 2006); State Rec., Vol. 41 of 72.

[9] State v. Cambre, 954 So. 2d 158 (La. 2007); State Rec., Vol. 67 of 72.

[10] State Rec., Vol. 42 of 72.

[11] State Rec., Vol. 26 of 72, Order dated June 5, 2008; State Rec., Vol. 26 of 72, Order dated September 17, 2008.

[12] Cambre v. Cain, No. 08-KH-1153 (La. App. 5th Cir. Mar. 3, 2009); State Rec., Vol. 63 of 72.

application,[13] the state district court again denied relief on January 9, 2020.[14]  On May 13, 2020,

the Louisiana Fifth Circuit Court of Appeal likewise vacated that ruling, holding that it was

premature because the state district court had not first ruled on the other related motions petitioner

filed with his post-conviction application.[15]  On remand, on August 20, 2020, the state district

court then denied those other motions and again denied post-conviction relief for the same reasons

noted in its January 9 ruling.[16]  Petitioner's related writ applications were thereafter denied by the

Louisiana Fifth Circuit Court of Appeal on January 12, 2021,[17] and the Louisiana Supreme Court

on January 26, 2022.[18]

## II.  Petitioner's Federal Application

On February 23, 2022, petitioner filed the instant federal application seeking habeas corpus

relief.[19]  The state takes the position that the application appears to be timely and the claims appear

to be exhausted; however, the state argues that relief should be denied because petitioner's claims

are procedurally barred and/or without merit.[20]

### A.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "modified a

federal habeas court's role in reviewing state prisoner applications in order to prevent federal

habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible

under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).  To that end, the AEDPA incorporated a

---

[13] State Rec., Vol. 26 of 72.
[14] State Rec., Vol. 61 of 72, Order dated January 9, 2020.
[15] Cambre v. Cain, No. 20-KH-108 (La. App. 5th Cir. May 13, 2020); State Rec., Vol. 64 of 72.
[16] State Rec., Vol. 61 of 72, Order dated August 20, 2020.
[17] Cambre v. Cain, No. 20-KH-382 (La. App. 5th Cir. Jan. 12, 2021); State Rec., Vol. 65 of 72.
[18] Cambre v. Cain, 331 So. 3d 916 (La. 2022); State Rec., Vol. 72 of 72.
[19] Rec. Doc. 3.
[20] Rec. Doc. 16.

"relitigation bar" in 28 U.S.C. § 2254(d), see Langley v. Prince, 926 F.3d 145, 155 (5th Cir. 2019),

which requires federal courts to accord a high degree of deference to state court decisions denying

a prisoner's claims on the merits.

Regarding § 2254(d), the United States Fifth Circuit Court of Appeals has explained:

> In enacting that provision, Congress imposed strict limitations on federal courts considering habeas applications from state prisoners. See, e.g., Harrington v. Richter, 562 U.S. 86, 102, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011); Langley v. Prince, 926 F.3d 145, 155 (5th Cir. 2019) (en banc), cert. denied, ___ U.S. ____, 140 S. Ct. 2676, 206 L.Ed.2d 826 (2020) (mem.); see also Shinn v. Kayer, ___ U.S. ___, 141 S. Ct. 517, 526, ___ L.Ed.2d ___ (2020) (per curiam) ("Under AEDPA, state courts play the leading role in assessing challenges to state sentences based on federal law."). "To overcome AEDPA's relitigation bar, a state prisoner must shoehorn his claim into one of its narrow exceptions." Langley, 926 F.3d at 155; see 28 U.S.C. § 2254(d)(1)-(2).

Lucio v. Lumpkin, 987 F.3d 451, 467 (5th Cir. 2021) (textual alteration removed).

The Fifth Circuit has observed that there are three such exceptions:

> The statute provides three exceptions to the general relitigation bar. A petitioner may obtain federal habeas relief on a claim that has been litigated in state court if the petitioner can show that the state court's decision was **contrary to** a federal law that was clearly established in Supreme Court holdings, that the decision was an **unreasonable application** of such law, or that the decision was based on an **unreasonable factual determination**.

Williams v. Thaler, 684 F.3d 597, 602 (5th Cir. 2012) (emphasis added).

The "contrary to" exception is found in 28 U.S.C. § 2254(d)(1). Regarding the exception,

the Fifth Circuit has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (footnotes, quotation marks, ellipses, and brackets omitted).  The "contrary to" exception is narrow and "does not apply" "in most AEDPA cases."  Langley, 926 F.3d at 155-56.

The "unreasonable application" exception, which is likewise found in 28 U.S.C. § 2254(d)(1), is more often litigated but "almost equally unforgiving."  Id. at 156.  Concerning that exception, the United States Supreme Court has explained:  "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case."  White v. Woodall, 572 U.S. 415, 426 (2014).  But the Supreme Court expressly cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error.  Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.  AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id. (citations and quotation marks omitted).

Further, for that "unreasonable application" exception to apply, "a prisoner must show far more than that the state court's decision was 'merely wrong' or 'even clear error.'"  Kayer, 141 S. Ct. at 523 (quoting Virginia v. LeBlanc, 582 U.S. 91, 94 (2017)); see also Bell, 535 U.S. at 694 ("[A]n unreasonable application is different from an incorrect one.").  Indeed:

> "[T]he [AEDPA's] relitigation bar forecloses relief unless the prisoner can show the state court was *so* wrong that the error was well understood and comprehended in existing law beyond any possibility for fairminded disagreement.  In other words, **the unreasonable-application exception asks whether it is beyond the realm of possibility that a fairminded jurist could agree with the state court.**

Langley, 926 F.3d at 156 (boldface emphasis added; citations and quotation marks omitted). "Under AEDPA's relitigation bar, the very existence of reasonable disagreement forecloses relief." Id. at 170.

It is also important to note that the foregoing deferential standards of review are mandated even when the state court's reasons for denying a claim are **unexplained**. In those instances, "a habeas court must determine what arguments or theories … **could have** supported … the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that **those** arguments or theories are inconsistent with the holding in a prior decision of this Court." Richter, 562 U.S. at 102 (emphasis added); accord Sexton v. Beaudreaux, 138 S. Ct. 2555, 2558 (2018); Cullen v. Pinholster, 563 U.S. 170, 188 (2011).

The third exception, which is found in 28 U.S.C. § 2254(d)(2), concerns a state court's factual determinations. Under that exception, a federal court shall not grant relief with respect to any claim adjudicated on the merits in state court proceedings "unless the adjudication of the claim … resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). See also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

Regarding these standards of review, the Fifth Circuit recently emphatically reiterated:

> "When Congress supplies a constitutionally valid rule of decision, federal courts *must* follow it." Brown v. Davenport, ___ U.S. ___, 142 S. Ct. 1510, 1520, 212 L.Ed.2d 463 (2022) (emphasis added). "In AEDPA, Congress announced such a rule." Id. Congress "designed [AEDPA] to confirm that state courts are the

principal forum for asserting constitutional challenges to state convictions." Richter, 562 U.S. at 103, 131 S.Ct. 770. AEDPA's deference to state court decisions means *deference*, not *de novo*. Federal habeas review is "not a substitute for ordinary error correction through appeal." Id. at 102-03, 131 S.Ct. 770. "[I]f AEDPA makes winning habeas relief more difficult, it is because Congress adopted the law to do just that." Davenport, 142 S. Ct. at 1526.

Russell v. Denmark, 68 F.4th 252, 273 (5th Cir. 2023).

In summary, "AEDPA prevents defendants – **and federal courts** – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Renico v. Lett, 559 U.S. 766, 779 (2010) (emphasis added). And the Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein. Woodall, 572 U.S. at 417.

## B. Facts

On direct appeal, the Louisiana Fifth Circuit Court of Appeal summarized the facts of petitioner's case as follows:

> Karen Marrione, the wife of Kelly Marrione, testified that on July 9, 2003, her husband, a New Orleans police officer of twenty-eight years who had retired the previous November, cut the grass at their home and then decided to move furniture in preparation of getting carpet the next day. He then went to Lowe's Home Improvement Warehouse to get a dolly and returned home about 3:45 p.m. At this time, Mrs. Marrione was in a back bedroom and their daughter was outside of the home. Mrs. Marrione heard popping sounds which sounded like fireworks. She believed her husband and a neighbor were playing a joke. She then went down the hall and heard whizzing sounds around her and noticed glass in her kitchen. She also noticed a small white truck pulled all the way in her driveway. She went to the door to see what was going on and when she reached for the doorknob her husband said something like "Get out the way, I've been shot." Her husband went into the den, and because he was a prankster-type person, Mrs. Marrione thought he was playing a joke on her. He then fell to the floor, and she heard the truck quickly leaving her driveway. Mrs. Marrione called 9-1-1 and an ambulance responded. Road blocks were set up to allow the ambulance to get to Charity Hospital unhampered. Despite the efforts at Charity, Mr. Marrione did not survive.

Dr. Susan M. Garcia, an expert in the field of forensic pathology, performed Mr. Marrione's autopsy on July 10, 2003. According to Dr. Garcia, Mr. Marrione sustained gunshot wounds to both his upper and lower arm. The gunshot to the lower arm exited his forearm and reentered his chest, causing a lethal injury to his heart. As a result of this injury, Mr. Marrione bled to death internally.

Connie Fossier, Mr. Marrione's next door neighbor, testified that on the afternoon of July 9, 2003, Mr. Marrione drove up in his vehicle, rolled down his window and chatted with her for about five minutes before she went inside her house. Less than two minutes later, she heard what sounded like fireworks, a rapid succession of seven or eight shots. She then heard three softer, weaker sounding shots and noticed that a window in her house broke. After hearing another set of shots, she went to her side door and saw a white truck with two white males backing out of Mr. Marrione's driveway. She then went to her front window to try to get the vehicle's license plate number; however, the license plate was perfectly covered with what looked like a white cloth.

Kristy Masangya, who lived across the street and two houses over from Mr. Marrione's house, testified that as she was walking towards her sidewalk she heard loud booms coming from down the street. She saw a white truck with two white males and a broken passenger window peeling out of Mr. Marrione's driveway. The license plate was covered with what appeared to be a white tee shirt.

Rene Gelpi and Loren Acosta also testified at trial. On the date of the incident, Rene Gelpi met Loren Acosta at Loren's house around 12:30 or 1:00, they went to eat lunch, and then went to the laudromat [sic] and the car wash. Loren received a telephone call from defendant. According to Loren, defendant said he had gotten into a situation with an individual where he was going to rob him but for some reason he did not. When Loren hung up the telephone, he told Rene, "the dumb asses are out trying to rob people." After going to wash his car, Loren received a telephone call from Donald Logan.[FN 3] Based on this call, they picked up Rene's Expedition at Loren's house; Rene drove to defendant's house on Dalton Street. When they arrived, defendant was laying on the sofa bleeding from a gunshot wound. Logan was present and a white truck was backed into the driveway at defendant's house.

> [FN 3] Loren had a car wash receipt from July 9, 2003 at 3:56 p.m. Dispatch time for the homicide was at 3:45 p.m. Telephone records of Loren and the Cambre number were compared. These records showed that on July 9th at 3:10 p.m. the Cambre number called Loren, and at 3:58 p.m. another call was made to Loren. Loren's records showed incoming calls on July 9th at 3:10 p.m. and at 3:58 p.m. Defendant admitted that he talked to Loren at 3:10 p.m., but stated that they discussed getting Loren's car towed and that Loren was called again by Logan at 3:58 p.m.

Loren and Rene took defendant to Charity Hospital in Rene's Expedition. Rene testified that en route to Charity Hospital, he asked defendant what this was about and that defendant responded, "I ran up to the guy and told him to put his

hands up and he came up with a gun and he shot me. And I took off running back to the car, shooting." According to Rene, when asked why he was robbing him, defendant replied that it was for a Rolex. Loren stated that while on the telephone, he overheard defendant saying something to Rene about how he robbed somebody or tried to, and that he got into it with somebody over a watch in Metairie. However, defendant testified that he told Rene and Loren he was shot by a police officer who was supposed to fix some tickets for him and did not tell them he was shot while trying to rob someone of his Rolex. Mr. Marrione had a Rolex watch.

Rene testified that, once they got to the hospital, the story would be that defendant was shot while he was robbed Uptown. Loren testified that defendant said he would give a false name, Marcus Jackson, and a false address of where he was supposedly robbed. About five to ten minutes after arriving at the hospital, Loren was questioned by an officer. At first he lied to the police, but he ultimately told the truth. Rene was questioned as well. He ultimately told the truth and pointed out defendant's house to an officer. A key case was recovered from the Expedition which contained defendant's identification.

Through interviews with Rene and Loren, it was determined Logan was the other person involved. Defendant was arrested at Charity Hospital and Logan was arrested at his residence on July 9th. A search warrant was executed at Logan's residence; on the dresser in his bedroom, a classified section of a newspaper which pertained to a Rolex watch was recovered. After speaking with Logan's brother, it was learned that either Logan's girlfriend or her father owned a white Toyota truck. Thereafter, the truck was located.[FN 4]

[FN 4] The truck had a broken passenger side window, and glass particles were recovered from the scene.

Defendant's residence on Dalton Street was searched and no weapons used for the July 9th shooting were found. However, Defendant's brother, Frederick "Sonny" Cambre, provided that he found the guns at that address underneath a child's dresser on the floor after the police had searched the house. These guns, a Beretta .380 caliber semiautomatic and a Browning .380 caliber semiautomatic, were the weapons used on July 9th, with four shots being fired from the Browning and seven from the Beretta.

Lieutenant Dwayne Scheuermann with the New Orleans Police Department collected evidence from Mr. Marrione's person such as his retired police commission, a wallet, a Lowe's store receipt from July 9, 2003 at 3:20 p.m., a watch, a chain and some change.[FN 5] According to Lieutenant Scheuermann, he asked defendant at the hospital what happened to him and was told that his name was Marcus Jackson and he was in the 1700 block of Hillary Street when he was robbed and shot by a black male.[FN 6] Lieutenant Scheuermann went to the location and confirmed that the location was a cemetery. The address where he said he lived was non-existent too.

[FN 5]  About three pennies were found on Mr. Marrione.  According to Mrs. Marrione, her husband always carried a money clip with him.  No money clip was found on him, and Mrs. Marrione did not know what happened to it.

[FN 6]  Delores M. Thornton, a Charity Hospital patient liaison, testified that she was also supplied the name Marcus Jackson from the patient and his friend, Loren Acosta.

Warren Smith, a registered nurse at Charity Hospital, testified that he remembered filling out defendant's assessment form on July 10, 2003 while defendant was shackled to the bedside.  He testified that defendant told him he was there because "I was shot in a robbery attempt."  Defendant denied saying this and instead testified that he was asked why he was in there and responded that "the police say I got shot in an attempted robbery."

Red blood-like substances tested from the Dalton Street address, from the Toyota truck and the Expedition were found to be consistent with defendant. Testing also revealed that droplets of blood found at the crime scene were consistent with defendant's DNA.

Timothy Scanlan, an expert in the fields of firearm and tool marks, blood stain pattern analysis, forensic science and crime scene reconstruction, testified that he participated in the crime scene investigation.  The victim's weapon, a .22 caliber mini revolver which held five shots, was recovered from the scene lying in the threshold of the doorway, and five fired cartridge casings from that weapon were also recovered.[FN 7]  At the scene, eleven shots were fired but only ten .380 caliber casings were found; however, in the bed of the truck, a fired cartridge casing that matched the casings from the driveway area was recovered.  It was determined that three shots actually went through the door itself and two shots passed through the door when it was open, with a total of five shots going into the residence.  He testified that he believed Mr. Marrione forcibly closed the door while taking fire. Scanlan testified that by having defendant's blood in the truck and the casing in the truck's bed, the casing links the truck to the scene and the blood in the truck links defendant to the truck.

[FN 7]  Mr. Marrione was authorized to carry a concealed weapon.

Scanlan testified that .380 semi-automatics in general will make louder sounds when fired and will shoot much faster than a .22.  He testified that the description given by Connie Fossier regarding the shots she heard would suggest that the .380 auto weapons were fired first, then the quieter .22 and then again the louder .380 auto weapons.

Defendant testified to the following:  On December 10, 2002, he had a court appearance in front of Judge Quinlin in Criminal District Court where he entered a plea of guilty to possession of marijuana.  Frederick, defendant's brother, brought him to court.  They got there around 9:00 and left at 11:30.  Defendant agreed that he met with Mr. Marrione on this day he guessed between 10:00 and 11:00. However, on redirect, defendant provided that he did not know precisely what time

or what date he met with Mr. Marrione at court.  Outside of the courtroom on the second floor, Mr. Marrione came up to him, asked if he had a legal problem and introduced himself as Kelly, a retired police officer of twenty-eight or thirty years. Defendant responded that he had a legal problem regarding his driver's license and tickets.  After Mr. Marrione said he could probably get it taken care of for him, he took defendant's subpoena and wrote down Kelly, NOPD, a telephone number, DL for driver's license and a dollar sign.  Mr. Marrione also gave him a business card which indicated that he was a police officer and wrote his pager number on it.

Defendant testified that he had a job opportunity that required him to have a license.  In April, defendant paged Mr. Marrione, and when he called back defendant gave him some information he needed to get defendant's driver's license and tickets taken care of.  Two days later, he learned it would cost $3500.00. Defendant's parents agreed to loan him the money in April of 2003, and he met Mr. Marrione at the Tiffin Inn on Veterans to give him the money.  Three days later, Mr. Marrione told him it was going to cost an additional $1000.00, so he borrowed that money from his parents as well.  That night on April 23rd, Mr. Marrione came to his house for the money and told defendant to reach him the next day; however, defendant provided that Mr. Marrione never responded to his calls.[FN 8]

> [FN 8] Cell phone records of Mr. Marrione did not contain defendant's phone number.

According to defendant, on July 9, 2003, he went to Lowe's with Logan in Logan's girlfriend's truck.  Because there was a ladder in the back of the truck, he agreed to watch it so no one would take it while Logan went into the store to buy a hacksaw.  He saw Mr. Marrione coming out of Lowe's across the parking lot putting a hand truck in the back of his vehicle.  When Logan returned to the truck, defendant told Logan to try to catch Mr. Marrione as he exited the parking lot.  They followed Mr. Marrione from Lowe's and en route, defendant explained to Logan why he wanted to follow Mr. Marrione.

Upon arriving at Mr. Marrione's residence, defendant got out of the passenger side of the truck while Mr. Marrione was coming out of his back door. Defendant said "What's going on, I gave you my money, you're supposed to take care of my license, what's the deal?"  Mr. Marrione looked surprised and turned to shut the door.  The door was not opened again until after the shooting was finished. Mr. Marrione appeared to be intoxicated and responded, "What the f* * * you're doing at my house, who told you to come here?"[FN 9]  Mr. Marrione fired the first shot and looked surprised when the gun went off.  This shot went into defendant's kidney and defendant fell to the ground and did not get off the ground until the shooting stopped and Logan helped him up.  Although defendant denied knowing at that time Mr. Marrione was hit by a bullet, he admitted that Mr. Marrione was hit with two of defendant's bullets.  Defendant had the Browning gun in his pocket and fired four shots back.  Mr. Marrione fired at least three shots before he got his gun out to fire one.  Logan was shooting behind him.

[FN 9] At the time of the autopsy, Mr. Marrione had .13 percent alcohol in his blood. Connie Fossier, Mr. Marrione's neighbor, testified that he did not seem intoxicated to her when she talked to him.

Defendant testified that he killed Mr. Marrione in self-defense. He provided that this had nothing to do with robbing or attempting to rob him and that nothing was taken from Mr. Marrione. Defendant explained that the ladder in the back of the truck was tied to the bumper and denied that the license plate was intentionally covered.[FN 10]

[FN 10] Kristy Masangya did indicate to the police that there may have been a ladder in the back of the truck. However, Rene denied seeing a ladder in the white truck at defendant's house.

When defendant got to his house, he learned Logan had called Loren from defendant's phone and told him defendant needed a ride to the hospital. Defendant provided that he went to Charity and while he was there he was on his back surrounded by police who were pushing him down, holding him by his neck, strangling him, slapping him and saying they knew he killed a police officer. They threatened to beat him up and kill him. They were strangling and slapping him. Defendant believed if he told them he shot Mr. Marrione he may have been killed and, therefore, he used the name Marcus Jackson and said he was shot and robbed on Hillary Street.

Defendant's mother, Sandra Cambre, and his father, Gilbert Cambre, testified that they were aware their son's driver's license was suspended and that he was attempting to get his driver's license back with the help of a retired policeman. They testified that their son asked for money in April of 2003 and that they loaned their son $3500.00 and then another $1000.00 two or three days later to get his driver's license back. Defendant's mother specifically recalled that the first loan of $3500.00 was given to him on April 21, 2003. According to defendant's parents, defendant had job opportunities for which he needed his driver's license.

In May of 2003, defendant's mother bought defendant's house and with the money he received from the equity, defendant repaid his parents. According to defendant's mother, defendant repaid her this money and other money he owed her, totaling $7000.00, and that the $12,291.48 balance was deposited into defendant's account on May 14, 2003. The balance of this account on July 1, 2003 was $480.88, and then on July 7, 2003 it was $48.63. Defendant's mother provided that large sums of money were withdrawn to fix his car.

Defendant's father testified that during the investigation of this case, he wore defendant's jacket that was at his house. A paper with the name "Kelly" and a phone number fell out of the pocket when he got to work. Defendant testified that the handwriting on the back of this document was his. Defendant provided that the 822-5711 number was the first number Mr. Marrione gave him. Lieutenant

12

Grey Thurman of the Jefferson Parish Sheriff's Office testified that, before defendant's father located the document with this phone number in the jacket, defense counsel faxed Mr. Marrione's cell phone records to him and this number appeared once in those records.[FN 11]  This telephone call lasted one minute, and the number was for Armondo Leyva and his wife Esperanza Leyva who only speaks Spanish.[FN 12]  Esperanza Leyva testified through an interpreter and denied knowing Mr. Marrione.

> [FN 11]  Defendant's father, an employee of Bell South Technology, assisted defense counsel with telephone records and numbers, including accessing certain numbers and names.  Although he did not recall viewing Mr. Marrione's cell phone records, he admitted that he was given some numbers by the defense from Mr. Marrione's records during the first trial.
>
> [FN 12]  Lieutenant Thurman testified that *821*-5711 was Malcolm Faber's Trophy Shop and it was determined that Mr. Faber knew Mr. Marrione. (Emphasis added).

Defendant's brother, Frederick Cambre, testified that he brought defendant to Orleans Parish Criminal District Court in December of 2002.  He testified that he went outside and smoked a cigarette and made it back before his brother went into court.  He provided that when he was walking up the stairs he saw his brother shaking hands with Mr. Marrione, but did not hear their conversation.  He provided that on December 10th, he picked up his brother and they got to court around 8:30.  He believed defendant pled guilty and they left around 11:30.

Another brother of defendant, Tyrus Cambre, testified that he was introduced to Mr. Marrione as "Officer Kelly" while he was at defendant's house on Dalton Street in late April to get $1000.00.  According to Tyrus, Mr. Marrione and his brother talked in private and he stayed under five minutes.  Tyrus provided that afterwards defendant told him that this officer was going to fix some tickets for him and help him get his license back.

Defendant's sister, Leslie Cambre Hoffman, testified as well.  She provided that she was aware that defendant had borrowed some money to pay either a police officer or a retired police officer to get his driver's license back.

Tina Schiaffino,[FN 13] Operations Manager of Dillard's Department Store, testified that she pulled Mr. Marrione's credit card receipt from Dillard's Department Store at the Esplanade Mall in Kenner for December 10, 2002 at 11:03 a.m.  This was the date and time that defendant testified he first met Officer Marrione in the Gretna courthouse.  The Dillard's record indicates that on this date, a credit card purchase was made for male clothing, and the receipt was signed by Mr. Marrione.  Mrs. Marrione identified her husband's signature.

> [FN 13]  It is noted that her last name is also spelled "Sciaffino" in the record.[21]

---

[21] <u>State v. Cambre</u>, 939 So. 2d 446, 448-54 (La. App. 5th Cir. 2006); State Rec., Vol. 41 of 72.

## C.  Plaintiff's Claims

### 1.  Ineffective Assistance of Trial Counsel[22]

Petitioner's first claim is that his trial counsel was ineffective in numerous respects.  The record reflects that petitioner initially asserted ineffective assistance claims on direct appeal, but the Louisiana Fifth Circuit Court of Appeal declined to address them, noting that such claims are more properly asserted and addressed in post-conviction proceedings.[23]  When he then brought an ineffective assistance claim in his state post-conviction application,[24] the state district court addressed the claim in detailed rulings dated June 5 and September 17, 2008;[25] however, both of those rulings were subsequently vacated by the Court of Appeal, and the matter was remanded for further proceedings.[26]  After petitioner then filed a supplemental post-conviction application,[27] the state district court again denied relief on January 9, 2020, stating:

> The petitioner asserts that he suffered ineffective assistance of counsel in a lengthy list of complaints.
>
> Under the well-known standard set out in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and State v. Washington, 491 So.2d 1337 (La. 1986), a conviction must be reversed if the petitioner proves (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's inadequate performance prejudiced defendant to the extent that the trial was rendered unfair and the verdict suspect.  State v. Legrand, 2002-1462 (La. 12/3/03), 864 So.2d 89.
>
> To be successful in arguing ineffective assistance of counsel, a post-conviction petitioner must prove deficient performance to the point that counsel is not functioning as counsel within the meaning of the Sixth Amendment of the Constitution.  A petitioner must also prove actual prejudice to the point that the results of the trial cannot be trusted.  It is absolutely essential that both prongs of the Strickland test must be established before relief will be granted by a reviewing court.

---

[22] Rec. Doc. 3-1, pp. 10-55.
[23] State v. Cambre, 939 So. 2d 446, 459-61 (La. App. 5th Cir. 2006); State Rec., Vol. 41 of 72.
[24] State Rec., Vol. 42 of 72.
[25] State Rec., Vol. 26 of 72, Order dated June 5, 2008; State Rec., Vol. 26 of 72, Order dated September 17, 2008.
[26] Cambre v. Cain, No. 08-KH-1153 (La. App. 5th Cir. Mar. 3, 2009); State Rec., Vol. 63 of 72.
[27] State Rec., Vol. 26 of 72.

> There is a strong presumption that counsel's performance is within the wide range of effective representation. Significantly, effective counsel does not mean errorless counsel and the reviewing court does not judge counsel's performance with the distorting benefits of hindsight, but rather determines whether counsel was reasonably likely to render effective assistance. State v. Soler, 93-1042 (La.App. 5 Cir. 4/26/94), 636 So.2d 1069, 1075.
>
> The Court finds that the defendant has not met his heavy burden of proof that counsel was ineffective, either in his original (and already reviewed) application nor in his supplemental application. Furthermore, the claims of ineffective assistance of counsel that have already been reviewed are repetitive and thus barred by application of LSA-C.Cr.P. art. 930.4(A). For these reasons, the court denied the defendant's first claim.
>
> This claim has no merit.[28]

However, the Court of Appeal vacated that ruling as premature because the state district court had not ruled on other motions petitioner filed with his post-conviction application.[29] Thereafter, on remand, the state district court then once again denied petitioner's ineffective assistance claim on August 20, 2020, stating that "the Court's Order, findings and reasons dated January 9, 2020 [were being] readopted as the order of the court."[30]

When petitioner sought supervisory review of that denial, the Louisiana Fifth Circuit Court of Appeal likewise denied his ineffective assistance claim, holding:

> [Petitioner] asserted that his trial counsel was ineffective and he raised several allegations in support of this assertion. Although relator briefly sets forth argument in his writ application regarding ineffective assistance of trial counsel, he does not specifically address any of the allegations he raised in his APCR [Application for Post-Conviction Relief]. Nevertheless, we have reviewed relator's claims of ineffective assistance of trial counsel in his APCRs and we find relator has not met his burden of proof.
>
> Under the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution, a defendant is entitled to effective assistance of counsel. State v. Casimer, 12-678 (La. App. 5 Cir. 3/13/13), 113 So.3d 1129, 1141. To prove ineffective assistance of counsel, a defendant must satisfy the two-prong test set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80

---

[28] State Rec., Vol. 61 of 72, Order dated January 9, 2020, p. 2.
[29] Cambre v. Cain, No. 20-KH-108 (La. App. 5th Cir. May 13, 2020); State Rec., Vol. 64 of 72.
[30] State Rec., Vol. 61 of 72, Order dated August 20, 2020.

L.Ed.2d 674 (1984).  Casimer, 113 So.3d at 1141.  Under the Strickland test, the defendant must show:  (1) that counsel's performance was deficient, that is, that the performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) that the deficient performance prejudiced the defense.  Id.  To prove prejudice, the defendant must demonstrate that, but for counsel's unprofessional conduct, the outcome of the trial would have been different.  Id. (citing Strickland, *supra*).

There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  State v. Griffin, 14-450 (La. App. 5 Cir. 12/16/14), 167 So.3d 31, 48, writ denied, 15-148 (La. 11/20/15), 180 So.3d 315.  Therefore, defendant must overcome the presumption that under the circumstances, the challenged action "might be considered sound trial strategy." Strickland, *supra*; Griffin, *supra*.  The Sixth Amendment does not guarantee errorless counsel or counsel judged ineffective by hindsight.  Id.

After review of relator's allegations of ineffective assistance of trial counsel …, we find that, on the showing made, relator did not meet his burden of proving that his trial counsel was ineffective and that prejudice resulted.  Relator does not demonstrate how the allegations presented meet the Strickland standard.  Further, relator has not met his burden of proving that his trial counsel's actions were sufficient to undermine the confidence in the outcome of the trial.  Accordingly, on the showing made, we find that the trial court did not err by denying relator's claims of ineffective assistance of trial counsel. [31]

When petitioner then sought further review by filing a related writ application with the Louisiana Supreme Court, that court stated simply:  "Denied.  Applicant shows no lower court error."[32]

Because petitioner's ineffective assistance of counsel claim was denied on the merits by the state courts, he faces even greater obstacles to obtaining relief on the claim in federal court. Specifically, under the AEDPA's deferential standards of review, he must show that the state court decision denying the claim on the merits was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28

---

[31] Cambre v. Cain, No. 20-KH-382, pp. 3-4 (La. App. 5th Cir. Jan. 12, 2021); State Rec., Vol. 65 of 72.
[32] Cambre v. Cain, 331 So. 3d 916 (La. 2022); State Rec., Vol. 72 of 72.

U.S.C. § 2254(d)(1); Adekeye v. Davis, 938 F.3d 678, 682 (5th Cir. 2019); Moore v. Cockrell, 313

F.3d 880, 881 (5th Cir. 2002).  For the following reasons, he has not made that showing.

Here, the state courts correctly noted that the clearly established federal law governing

ineffective assistance of counsel claims is Strickland v. Washington, 466 U.S. 668 (1984).  In

Strickland, the United States Supreme Court held:

> A convicted defendant's claim that counsel's assistance was so defective as
> to require reversal of a conviction … has two components.  First, the defendant
> must show that counsel's performance was deficient.  This requires showing that
> counsel made errors so serious that counsel was not functioning as the "counsel"
> guaranteed the defendant by the Sixth Amendment.  Second, the defendant must
> show that the deficient performance prejudiced the defense.  This requires showing
> that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial
> whose result is reliable.  Unless a defendant makes both showings, it cannot be said
> that the conviction … resulted from a breakdown in the adversary process that
> renders the result unreliable.

Id. at 697.

When assessing whether counsel's performance was deficient, a court must always be

mindful that "Strickland does not guarantee perfect representation, only a reasonably competent

attorney."  Harrington v. Richter, 562 U.S. 86, 110 (2011).  Therefore, "[t]o establish deficient

performance, a person challenging a conviction must show that counsel's representation fell below

an objective standard of reasonableness."  Id. at 104 (quotation marks omitted).  Moreover, the

Supreme Court has cautioned:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is
> all too tempting for a defendant to second-guess counsel's assistance after
> conviction or adverse sentence, and it is all too easy for a court, examining
> counsel's defense after it has proved unsuccessful, to conclude that a particular act
> or omission of counsel was unreasonable.   A fair assessment of attorney
> performance requires that every effort be made to eliminate the distorting effects of
> hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to
> evaluate the conduct from counsel's perspective at the time.  Because of the
> difficulties inherent in making the evaluation, a court must indulge a strong

> presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

Strickland, 466 U.S. at 689 (citations and quotation marks omitted).

Strickland's prejudice component is no less exacting. The Supreme Court has explained:

> In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, Strickland asks whether it is reasonably likely the result would have been different. This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable.

Richter, 562 U.S. at 111-12 (citations and quotation marks omitted).

Further, where, as here, a petitioner is seeking federal habeas review of a Strickland claim that was on the merits in state court, the issue is even narrower. Specifically, the issue for the federal habeas court is "whether the state court's **application of the Strickland standard** was **unreasonable**." Id. at 101 (emphasis added). In other words, "the question is **not** whether counsel's actions were reasonable. **The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard**." Id. at 105 (emphasis added). That makes the petitioner's already difficult task even more so, because the federal court must accord the state court decision "a deference and latitude that are not in operation when the case involves review under the Strickland standard itself." Id. at 101; see also id. at 105 ("The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so."). As a result, in effect, the federal court must "afford **both** the state court **and the**

defense attorney the benefit of the doubt."  <u>Woods v. Etherton</u>, 578 U.S. 113, 117 (2016) (emphasis added; quotation marks omitted).

In the instant case, petitioner contends that his trial counsel was ineffective in numerous respects.  Each of those contentions will now be addressed in turn.

### a.  Failure to Hire a Forensic Expert[33] / b.  Failure to Retain a Qualified
### Forensic Expert to Review the State's Reconstruction Evidence
### and to Provide Expert Defense Testimony at Trial[34]

Petitioner's first contention is that counsel was ineffective for failing to hire – or secure court funds to hire – a forensic expert to counter the testimony of Timothy Scanlan, the prosecution's expert in the fields of firearm and tool marks, blood stain pattern analysis, forensic science, and crime scene reconstruction.

In one of its earlier rulings, the state district court addressed and rejected that contention, stating:

> It is important to remember that while the accused has a constitutional right to effective counsel, "[t]he Constitution does not entitle a criminal defendant to the effective assistance of an expert witness.  To entertain such claims would immerse federal judges in an endless battle of the experts…."[FN4]
>
> [FN 4]  <u>Wilson v. Greene</u>, 155 F.3d 396, 401 (4th Cir.), cert. denied sub nom. <u>Wilson v. Taylor</u>, 525 U.S. 1012, 119 S.Ct. 536, 142 L.Ed.2d 441 (1998).
>
> In order to resolve the ineffectiveness question as it relates to retention of defense experts, it is necessary to review the constitutional requirements for state funded experts.  The United States Supreme Court held in <u>Ake v. Oklahoma</u>,[FN 5] that an indigent criminal defendant is entitled to a mental health expert after making a sufficient showing that it is required under principles of fundamental fairness.  Notably, the Supreme Court has not extended the holding of <u>Ake</u> to non-psychiatric experts.[FN 6]  It is also notable that the petitioner does not contend there are new facts that have been discovered.  Instead, he seeks to impeach the

---

[33] Rec. Doc. 3-1, pp. 11-23.
[34] <u>Id.</u> at pp. 23-29.

state's expert witness with a witness of his own choosing and who is basing his opinion solely on evidence already collected.

[FN 5]  Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).
[FN 6]  Caldwell v. Mississippi, 472 U.S. 320, 323 n.1 (1985).

In reviewing a similar complaint of a trial attorney's decision not to request a state-funded psychiatric expert, the federal habeas court in McGahee v. Campbell,[FN 7] observed that

Ake and Caldwell, taken together, hold that a defendant must demonstrate something more than a mere possibility of assistance from a requested expert; due process does not require the government automatically to provide indigent defendants with expert assistance upon demand.  Rather, a fair reading of these precedents is that a defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial.

[FN 7]  McGahee v. Campbell, 2007 WL 3037451, p. 62 (S.D. Ala., 10/15/07).

The court notes that defense attorney thoroughly cross-examined the state's expert witnesses on every issue.  The petitioner was convicted by overwhelming inculpatory evidence, of basically the defendant admitting his participation in the crime.

The petitioner has not met his burden of proof and has not shown that his attorney's decision not to call an expert witness was not a strategic decision.  Petitioner casts no doubt on any of the evidence which was presented at trial.  He fails to prove prejudice, given the overwhelming evidence placed before the jury.  In sum, he has not established that his attorney's performance in relation to expert witnesses was in any way constitutionally deficient.[35]

In its final ruling on petitioner's post-conviction application, the state district court then denied

petitioner's ineffective assistance claim more generally without again addressing this contention

specifically.[36]  And, as previously noted, his related writ applications were thereafter denied on

---

[35] State Rec., Vol. 26 of 72, Order dated September 17, 2008, pp. 2-3.
[36] State Rec., Vol. 61 of 72, Order dated August 20, 2020.

the merits by both the Louisiana Fifth Circuit Court of Appeal[37] and the Louisiana Supreme Court.[38]

For the following reasons, the undersigned finds that the state court decision denying petitioner relief based on this contention was not contrary to, and did not involve an unreasonable application of, clearly established federal law.  See 28 U.S.C. § 2254(d)(1).

The United States Fifth Circuit Court of Appeals has explained:

> Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain.  For this reason, we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense. This requirement applies to both uncalled lay and expert witnesses.

Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010) (citations, quotation marks, and brackets omitted).

As noted in the original Report and Recommendation, petitioner **did** identify the expert witness he contends should have been retained (either with funds supplied by his family or with funds obtained from the court[39]):  Richard N. Ernest.  In addition, petitioner supplied an affidavit

---

[37] Cambre v. Cain, No. 20-KH-382 (La. App. 5th Cir. Jan. 12, 2021); State Rec., Vol. 65 of 72.

[38] Cambre v. Cain, 331 So. 3d 916 (La. 2022); State Rec., Vol. 72 of 72.

[39] Under Louisiana law, funds are available under some circumstances to hire various types of experts to assist in the defense of indigent defendants.  See State v. Touchet, 642 So. 2d 1213, 1215 (La. 1994).  The Louisiana Supreme Court has explained:

> [F]or an indigent defendant to be granted the services of an expert at the expense of the state, he must establish that there exists a reasonable probability both that an expert would be of assistance to the defense and that the denial of expert assistance would result in a fundamentally unfair trial. To meet this standard, a defendant must ordinarily establish, with a reasonable degree of specificity, that the assistance is required to answer a substantial issue or question that is raised by the prosecution's case or to support a critical element of the defense.  If the trial court finds that the

executed by Ernest setting forth his credentials (which are not disputed by the state), identifying the portions of Scanlan's testimony that he believes are flawed, and stating that he would have testified regarding his expert conclusions at trial. Therefore, unlike many prisoners who assert such claims, petitioner has supplied evidentiary support required for his claim.

Nevertheless, as also noted in the original Report and Recommendation, that does not mean that relief is warranted. Although petitioner has met the threshold requirement for such a claim (establishing that an expert was available), he must also prove that counsel was ineffective for failing to retain the expert. That requirement is more difficult to meet because counsel's decision on such a matter is often a strategic one, and, as such, should not be lightly second-guessed. As the United States Supreme Court has explained:

> [W]e have often explained that strategic decisions – **including whether to hire an expert** – are entitled to a "strong presumption" of reasonableness. Harrington v. Richter, 562 U.S. 86, 104, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). Defense lawyers have "limited" time and resources, and so must choose from among "'countless'" strategic options. Id., at 106-107, 131 S.Ct. 770. Such decisions are particularly difficult because certain tactics carry the risk of "harm[ing] the defense" by undermining credibility with the jury or distracting from more important issues. Id., at 108, 131 S.Ct. 770.

Dunn v. Reeves, 141 S. Ct. 2405, 2410 (2021) (emphasis added).

In the cited case, Richter, the Supreme Court had explained:

> Rare are the situations in which the wide latitude counsel must have in making tactical decisions will be limited to any one technique or approach. It can be assumed that in **some** cases counsel would be deemed ineffective for failing to consult or rely on experts, but even that formulation is sufficiently general that state courts would have wide latitude in applying it.

---

indigent defendant is able to meet this standard, it is to authorize the hiring of the expert at the expense of the state.

Id. at 1216.

Richter, 562 U.S. at 106 (emphasis added; citation and quotation marks omitted).  Therefore, "[c]ounsel [i]s entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." Id. at 107.  As a result, even where a proposed expert's testimony might support a defense, there are still circumstances in which "a competent attorney might elect not to use it." Id. at 108.  For example, counsel might fear that an expert's testimony could ultimately "be harmful to the defense," "shift attention to esoteric matters of forensic science, distract the jury from whether [a particular witness] was telling the truth, or transform the case into a battle of the experts." Id. at 108-09.  In light of such considerations, "[t]o support a defense argument that the prosecution has not proved its case it sometimes is better **to try to cast pervasive suspicion of doubt** than to strive to prove a certainty that exonerates." Id. at 109 (emphasis added).

That is what defense counsel elected to do in this case.  Rather than call his own expert, he instead chose simply to try to cast doubt on Scanlan, the state's expert, through vigorous and relentless cross-examination.[40]  Even if a federal court might independently conclude – **in hindsight** – that it would have been better for defense counsel to have retained Ernest, that is far afield from the narrow scope of review mandated by the AEDPA.  Rather, again, the sole issue now is only whether the state court's decision denying the ineffective assistance of counsel claim was **unreasonable**.  And, although the state court's decision here was perhaps not unassailable, it would simply be a step too far to characterize it as unreasonable.  See, e.g., Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or

---

[40] State Rec., Vols. 16 and 17 of 72, transcript of March 6, 2005, pp. 65-262; State Rec., Vol. 17 of 72, transcript of March 7, 2005, pp. 5-37 and 51-188.

'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").  Indeed, as the United States Supreme Court has cautioned:

> [I]n reviewing the work of their peers, federal judges must begin with the "presumption that state courts know and follow the law." Woodford [v. Visciotti], 537 U.S. [19,] 24, 123 S.Ct. 357[, 154 L. Ed. 2d 279 (2002)].  Or, in more concrete terms, a federal court may grant relief only if *every* "'fairminded juris[t]'" would agree that *every* reasonable lawyer would have made a different decision. Richter, 562 U.S. at 101, 131 S.Ct. 770.

Reeves, 141 S. Ct. at 2411.

Of course, in his Traverse and Reply to State's Response in Opposition to Granting Writ of Habeas Corpus,[41] petitioner posits that defense counsel's failure to secure an expert such as Ernest was not in fact strategic but was instead simply the result of counsel's negligence.  As an example of such negligence, petitioner asserts that counsel believed, mistakenly, that no funds were available for an expert[42] – but then petitioner also promptly concedes that his "family offered funds pretrial to retain an expert."[43]  That concession does not bolster his argument; it undercuts it.  If petitioner's family offered such funding but counsel still eschewed it, then that suggests that counsel's decision was in fact made for strategic reasons, not simply out of a mistaken belief that funds were unavailable.

Petitioner next opines that "[t]he State paints its expert as nationally renowned and unimpeachable who gave sterling testimony,"[44] and he then launches into an argument that his proffered expert, Ernest, was much more qualified than the state's expert, Scanlan.[45]  But the relevant question is not whether Ernest was "better" than Scanlan; rather, it is whether defense

---

[41] Rec. Doc. 22-1.
[42] Id. at p. 2.
[43] Id.
[44] Id. at p. 3.
[45] Id. at pp. 3-5.

counsel was ineffective in adopting a strategy of (1) securing and consulting his own different expert, Wiley Beevers, (2) along with a vigorous cross-examination of Scanlan.  Counsel's selection of Beevers is addressed in detail *infra*, and for the reasons explained in that discussion, the selection of Beevers did not constitute ineffective assistance.  And, as already explained *supra*, a decision to rely on cross-examination to cast doubt on the state's case and its expert **can** be a legitimate and reasonable trial tactic.

For all of these reasons, the undersigned therefore again finds that petitioner's contentions concerning the failure to retain Ernest should be rejected.

### c.  Failure to Subpoena Notes Upon Which the Expert's Testimony Was Based[46]

Petitioner's next contention is that defense counsel was ineffective for failing to subpoena the notes and other materials Scanlan used in forming his expert opinion – notes and materials petitioner speculates could have then been used by defense counsel to cross-examine Scanlan more effectively at trial.  In the state post-conviction proceedings, the state district court denied petitioner's ineffective assistance claim generally without addressing this contention specifically.[47] His related writ applications were then denied on the merits by both the Louisiana Fifth Circuit Court of Appeal[48] and the Louisiana Supreme Court,[49] again without this contention being specifically addressed.  And, for the following reasons, the undersigned finds that the state court decision denying petitioner relief was not contrary to, and did not involve an unreasonable application of, clearly established federal law.  See 28 U.S.C. § 2254(d)(1).

---

[46] Rec. Doc. 3-1, pp. 29-31.
[47] State Rec., Vol. 61 of 72, Order dated August 20, 2020.
[48] Cambre v. Cain, No. 20-KH-382 (La. App. 5th Cir. Jan. 12, 2021); State Rec., Vol. 65 of 72.
[49] Cambre v. Cain, 331 So. 3d 916 (La. 2022); State Rec., Vol. 72 of 72.

As explained in the original Report and Recommendation issued in this case, petitioner's contention should be rejected for the most basic of reasons, namely that he has failed to show that there was in fact anything in those notes or materials which could have been used to effectively impeach Scanlan or cast doubt on his conclusions. Rather than evidence, petitioner offers only his own rank speculation that the notes and materials **might** have been helpful. That simply does not suffice to meet his burden of proof. See Quezada v. Avoyelles Correctional Center, Civ. Action No. 15-781, 2015 WL 5061230, at *22 (E.D. La. Aug. 17, 2015) ("A petitioner's bare speculation is insufficient to prove that prejudice resulted from an allegedly inadequate investigation."), certificate of appealability denied, No. 15-31052, 2017 WL 3895056 (5th Cir. April 4, 2017); see also Shelton v. Kent, Civ. Action No. 1:20-CV-01025, 2021 WL 6285930, at *4 (W.D. La. Nov. 15, 2021) ("Speculation about what the investigation would have yielded is insufficient to show prejudice under Strickland."), adopted, 2022 WL 59099 (W.D. La. Jan. 5, 2022), certificate of appealability denied, No. 22-30045, 2022 WL 18462066 (5th Cir. Oct. 2022), cert. denied, 143 S. Ct. 794 (2023).

Nothing in petitioner's Traverse and Reply to State's Response in Opposition to Granting Writ of Habeas Corpus[50] supports a different outcome in this reconsideration. Instead, in that document he simply reiterates his suggestion that counsel **should have** subpoenaed the notes. But, even accepting that contention as true, it addresses only the deficiency prong of the Strickland analysis. To prove an ineffective assistance claim, a petitioner must **also** establish that **prejudice actually resulted**. Petitioner has offered nothing on the prejudice prong except his own speculation, and, as already explained, that is not enough.

---

[50] See Rec. Doc. 22-1, pp. 6-7.

### d.  Retaining a Local Attorney Who Failed to Qualify as a Reconstruction Expert[51]

Petitioner next contends that although defense counsel did in fact retain one expert, Wiley Beevers, counsel was nevertheless still ineffective because the selection of Beevers was unreasonable.  In the state post-conviction proceedings, the state district court denied petitioner's ineffective assistance claim generally without addressing this contention specifically.[52]  His related writ applications were then denied on the merits by both the Louisiana Fifth Circuit Court of Appeal[53] and the Louisiana Supreme Court,[54] again without this contention being specifically addressed.  For the following reasons, the undersigned finds that the state court decision denying petitioner relief was not contrary to, and did not involve an unreasonable application of, clearly established federal law.  See 28 U.S.C. § 2254(d)(1).

The record reflects that the state, upon being notified that the defense intended to call Beevers as an expert, moved for a Daubert hearing.[55]  At that hearing, both the prosecutor and the judge expressed confusion over the precise areas of expertise for which the defense was seeking Beevers' qualification.  In response, defense counsel stated:

> I had anticipated that Mr. Beevers will, in fact, be present and will hear the testimony of the State's expert, which is proper at this point.  And then, in those

---

[51] Rec. Doc. 3-1, pp. 32-34.

[52] State Rec., Vol. 61 of 72, Order dated August 20, 2020.

[53] Cambre v. Cain, No. 20-KH-382 (La. App. 5th Cir. Jan. 12, 2021); State Rec., Vol. 65 of 72.

[54] Cambre v. Cain, 331 So. 3d 916 (La. 2022); State Rec., Vol. 72 of 72.

[55] State Rec. Vol. 1 of 72.  See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  In Daubert, the United States Supreme Court set a new standard to assist federal district courts in evaluating the admissibility of expert testimony. The new standard required the district courts to perform a "gatekeeping" function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589.  However, "Daubert is an exegesis of Rule 702 of the Federal Rules of Evidence and governs the admission of expert evidence in federal trials only.  **Daubert does not bind the states**, which are free to formulate their own rules of evidence subject only to the limits imposed by the Constitution." Kinder v. Bowersox, 272 F.3d 532, 545 n.9 (8th Cir. 2001) (emphasis added); accord Bridges v. Tanner, Civ. Action No. 17-1925, 2019 WL 3774446, at *7 (E.D. La. Aug. 12, 2019).  Nevertheless, the Louisiana Supreme Court found Daubert persuasive and, as a matter of state law, similarly adopted a "requirement that expert scientific testimony must rise to a threshold level of reliability in order to be admissible under La.C.E. art. 702." State v. Foret, 628 So. 2d 1116, 1123 (La. 1993).

areas that Mr. Beevers is qualified in, to give an opinion, then he would specifically be testifying in those areas, which we do every day in criminal court. So, that's one area that is a big area and I intend to use him for that.[56]

He continued:

I anticipate that he will be called to testify in the areas that he's qualified to testify in regarding the ballistics, regarding the use of firearms at this point and in other areas, he would, because of his experience, because of his prior qualifications, because of his training, would be permitted to testify in. And he truly has been qualified before in at least – I think they are like eight or nine courts listed on the Curricula Vitae that we have presented. Two or three in Jefferson and six or so, plus, in Orleans.[57]

Beevers then testified that he was an attorney and recounted his expertise concerning firearms, explaining that he "had been qualified as a firearms and ammunition expert in the Twenty-Fourth JDC, Section 'A', 'B', 'E', 'G', 'F', 'K', 'O', 'P' and 'I' and as well in criminal district court in at least Calvin Johnson and Jerome Winsberg's court."[58] At the conclusion of Beevers' testimony concerning his expertise, the trial judge ruled as follows:

THE COURT:
Okay. I have some concerns about stippling. I'm probably not going to qualify him in that area. I probably understand it as well as anybody, ballistics material seems to me the stuff that comes out of guns. I don't know. And I will let him testify on that. Trajectory; I'm going to want to know a little bit about his experience in the particular guns that we're dealing with and we may just do that outside the presence of the jury.
From what I can tell, and as Mr. Beevers' knowledge on weapons is based upon experience and I certainly can qualify somebody on particular – as an expert in particular areas of which they have a great deal of expertise, and he does. But he admitted that he does not really have any expertise, or doesn't have any knowledge of the stippling on skin. He has never looked at cadavers or pig skin to make those determinations, so that's why I'm pretty much eliminating stippling at this point in time. The rest of it, I'm probably going to allow. I am going – let me tell you this: I am going to be very careful in listening to some of this and may well excuse the jury when I've got some questions or not, and will allow the State to do

---

[56] State Rec., Vol. 10 of 72, transcript of February 25, 2005, p. 100.
[57] Id. at p. 101.
[58] Id. at p. 103.

some cross-examining during the time of his testimony. I don't know how else to put it.

It has still been a little more vague than I would have wanted it today. But so we can move this along, that's – those – stippling at this point, no. The rest of it, well, the materials, yes. That's – I will allow that.

THE CLERK:
Ballistics materials, yes?

THE COURT:
Yes.

THE CLERK:
Okay.

THE COURT:
The trajectory, I'm going to want to hear a little more on his knowledge of the particular weapons involved.

THE CLERK:
Okay. So, just ballistics materials?

THE COURT:
And so I'm going to withhold on that one and, like I said, we'll be listening very carefully and let you know if there's a point where I have a problem and the State, of course, is going to make their objections when they feel necessary to. So, you know, I hate to leave it up in the air that much, but that's what I am going to do.[59]

Ultimately, however, defense counsel elected not to call Beevers at trial.

As explained in the original Report and Recommendation, if petitioner is contending that counsel was ineffective for proposing Beevers as an expert witness **at all**, that contention is unpersuasive. Beevers had in the past repeatedly been qualified as a firearms expert in other cases, and he was in fact accepted as such in this case for some (albeit not all) purposes.

---

[59] Id. at pp. 131-33.

And as also explained, if petitioner is instead simply arguing that defense counsel was ineffective for not choosing a "better" expert, it must be noted that such arguments are disfavored. For example, although the United States Supreme Court has found deficient performance where counsel retained an expert even he believed to be inadequate, the Court took care to note that it was not opening the door to claims where, as here, counsel legitimately believed that he was retaining a qualified expert, explaining:

> We wish to be clear that the inadequate assistance of counsel we find in **this case does not consist of the hiring of an expert who, though qualified, was not qualified enough.** The selection of an expert witness is a paradigmatic example of the type of "strategic choic[e]" that, when made "after thorough investigation of [the] law and facts," is "virtually unchallengeable." Strickland, 466 U.S., at 690, 104 S.Ct. 2052. **We do not today launch federal courts into examination of the relative qualifications of experts hired and experts that might have been hired.** The only inadequate assistance of counsel here was the inexcusable mistake of law – the unreasonable failure to understand the resources that state law made available to him – that caused counsel to employ an expert that *he himself* deemed inadequate.

Hinton v. Alabama, 571 U.S. 263, 275 (2014) (boldface emphasis added; italics in original).

In his Traverse and Reply to State's Response in Opposition to Granting Writ of Habeas Corpus,[60] petitioner simply again argues that Beevers was unqualified and suggests that counsel was ineffective for selecting him. Those contentions were adequately addressed in the original Report and Recommendation and have been reiterated herein. No further discussion is warranted.

### e.  Failure to Effectively Cross-Examine a

### Witness Regarding the Sound and Sequence of the Shots[61]

Petitioner next contends that his counsel was ineffective in his cross-examination of Connie Fossier, one of the neighbors who heard the shots. In the state post-conviction proceedings, the

---

[60] See Rec. Doc. 22-1, pp. 10-11.
[61] Rec. Doc. 3-1, pp. 34-35.

state district court denied petitioner's ineffective assistance claim generally without addressing this contention specifically.[62] His related writ applications were then denied on the merits by both the Louisiana Fifth Circuit Court of Appeal[63] and the Louisiana Supreme Court,[64] again without this contention being specifically addressed.  For the following reasons, the undersigned finds that the state court decision denying petitioner relief was not contrary to, and did not involve an unreasonable application of, clearly established federal law.  See 28 U.S.C. § 2254(d)(1).

At trial, Fossier testified that she heard three series of shots, with the first series being loud, the second series being soft, and then a third series.[65]  That testimony regarding the difference in sound levels was important because the state's expert, Timothy Scanlan, then testified that a .22 caliber mini revolver (the weapon used by the victim) produces a softer sound than a .380 semi-automatic (the weapons used by petitioner and Logan).  Scanlan was therefore able to conclude that the sequence of shots described by Fossier indicated that the victim did not fire the first shots, contrary to petitioner's version of the events and his theory of self defense.[66]

In this component of his ineffective assistance claim, petitioner opined that defense counsel should have impeached Fossier on cross-examination with her initial statement as documented in a police report.  According to that report, she purportedly stated that there had been two groups of shots and failed to mention any difference in sound levels.

However, the original Report and Recommendation noted that defense counsel wanted to cross-examine Fossier regarding the series of shots and the relative sound levels, but **the trial**

---

[62] State Rec., Vol. 61 of 72, Order dated August 20, 2020.
[63] Cambre v. Cain, No. 20-KH-382 (La. App. 5th Cir. Jan. 12, 2021); State Rec., Vol. 65 of 72.
[64] Cambre v. Cain, 331 So. 3d 916 (La. 2022); State Rec., Vol. 72 of 72.
[65] She testified to that fact both on direct examination, see State Rec., Vol. 10 of 72, transcript of March 3, 2005, pp. 120 and 125, and on redirect examination, see State Rec., Vol. 12 of 72, transcript of March 3, 2005, p. 136.
[66] See State Rec., Vol. 16 of 72, transcript of March 6, 2005, pp. 63-64.

**judge would not permit him to do so**.  The transcript reflects that as defense counsel was cross-examining Fossier about her experience with guns, the prosecutor objected on the grounds of relevance.  At a bench conference, the following exchange then occurred:

> MR. REGAN [defense counsel]:
>> The State's asking her regarding **sounds of guns**.  And I'm trying to determine her familiarity with guns so that we can put some credibility to her responses regarding hearing **sounds of guns**.
>
> THE COURT:
>> Well, that has to do with her hearing, not with –
>
> MR. REGAN:
>> No, no, no.  Her ability to tell –
>
> MR. BORDELON [the prosecutor]:
>> Exactly, Judge. She can identify guns.
>
> THE COURT:
>> She said what she heard –
>
> MR. REGAN:
>> I think it's relative [sic] and it's probative and it's material to the case, and there's no basis not to answer the questions if she can answer it.
>
> MR. BORDELON:
>> But it has no relevance, Judge.
>
> THE COURT:
>> She can say what she heard.
>
> MR. REGAN:
>> The objection is relevance at this point, okay?  That's what I understand.
>
> THE COURT:
>> Yes.
>
> MR. REGAN:
>> And I'm saying that it's relevant at this point because she testified as to the **sounds of the weapons**.  You have to be able to determine that she knows what a weapon sounds like.  You have to –

MR. BORDELON:

    She didn't say that.  She said she thought it was firecrackers.

THE COURT:

    She thought it was firecrackers.  Pow, pow, pow.

MR. REGAN:

    I'm still – we're talking about a witness, an ear witness, not an eyewitness – and ear witness to an event.  I'm testing her knowledge of weapons at this point.

THE COURT:

    She never said she knew – she thought it was firecrackers.

MR. REGAN:

    Precisely.  And I need to bring this out at this point in my case.  How can it not be relevant to the issues in the case?

THE COURT:

    If she said she thought it was firecrackers, what more do you want her to do?

MR. REGAN:

    **They're going to do their closing argument based on the sounds that this woman heard, and the series of sounds and the levels of sounds**.

THE COURT:

    Yes.  All you can do is test her hearing.  That's what you need to test.  I'm going to sustain the objection.

MR. REGAN:

    Note my objection.

THE COURT:

    It's on the record.[67]

Obviously, counsel cannot be ineffective for failing to pursue a line of cross-examination that was disallowed by the presiding judge.

---

[67] State Rec., Vol. 10 of 72, transcript of March 3, 2005, pp. 132-34 (emphasis added)

The original Report and Recommendation also noted that, to the extent that petitioner was simply arguing that Fossier should have been specifically challenged on the ground that her testimony was inconsistent with her prior statement documented in the police report, that argument fared no better. Although the testimony and statement were inconsistent as to the groupings of shots (three in the testimony; two in the statement), that was of little consequence. A potentially important discrepancy would be as to which grouping of shots was softest – if it was the first grouping, then (according to Scanlan's theory) the victim fired first, as petitioner claims; if it was not the first, then the perpetrators fired first. **But petitioner does not contend that Fossier's statement as documented in the police report addressed the relevant sound levels at all.**[68] If it did not, then (1) there was no inconsistency on that issue, (2) Fossier therefore could not be impeached on that issue, and (3) defense counsel is not ineffective for foregoing a line of cross-examination having no impeachment value.

In both petitioner's Traverse and Reply to State's Response in Opposition to Granting Writ of Habeas Corpus[69] and his Objections to Magistrate's Report and Recommendation and Incorporated Memorandum,[70] he narrows the focus of this contention to address only counsel's failure to raise this purported "inconsistency" on **recross**-examination. Although the judge did not offer an opportunity for recross-examination of Fossier,[71] petitioner argues that counsel was nevertheless entitled to recross-examination under Louisiana Code of Evidence article 611 and should have requested it for this purpose. However, even if such recross-examination should have

---

[68] See Rec. Doc. 3-1, p. 35.
[69] See Rec. Doc. 22-1, pp. 8-9.
[70] See Rec. Doc. 22, pp. 11-14.
[71] See State Rec., Vol. 12 of 72, transcript of transcript of March 3, 2005, pp. 136-37.

been allowed, which is questionable,[72] the foregoing analysis of the original Report and Recommendation is still applicable and so reconsideration is not warranted.

### f.  Failure to Call Donald Logan as a Defense Witness[73]

Petitioner's next contention is that "[c]ounsel was ineffective for failing to call Donald Logan, who was the only person who could have substantiated [petitioner's] testimony that Marrione was shot in self-defense."[74]  In one of its earlier rulings, the state district court expressly addressed and rejected that contention, stating:

> The petitioner complains that his attorney failed to call as a defense witness Donald Logan, his co-defendant.  "There has never been a case where additional witnesses could not have been called….  We also refuse to say that a member of the bar is guilty of ineffectiveness for not calling every witness and friend who was willing to testify.  To hold otherwise would clog an already overburdened system with repetitious testimony."[FN 8]  This witness was awaiting trial for murder, and could have easily invoked his Fifth Amendment right against self-incrimination.  It is well settled that trial counsel's decision to call, or not to call, a particular witness is a matter for trial strategy and is not per se ineffective assistance of counsel.[FN 9]
>
> > [FN 8]  <u>State v. Tarver</u>, 629 So.2d 14, 21 (Ala. Crim. App. 1993), cert. denied, 511 U.S. 1078, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994).
> > [FN 9]  <u>State v. Washington</u>, 788 So.2d 596, 607 (La. App. 5 Cir. 5/16/1).[75]

In its final ruling on petitioner's post-conviction application, the state district court then denied petitioner's ineffective assistance claim more generally without again addressing this contention

---

[72] In pertinent part, article 611 provides: "A witness who has been cross-examined is subject to redirect examination as to matters covered on cross-examination and, in the discretion of the court, as to other matters in the case. **When the court has allowed a party to bring out new matter on redirect**, the other parties shall be provided an opportunity to recross on such matters." La. Code Evid. art. 611(D) (emphasis added).  Fossier's testimony on redirect examination concerning the sequence and sounds of the shots was not "new"; it was merely a reiteration of the testimony she had already given on direct examination.  <u>Compare</u> State Rec., Vol. 10 of 72, transcript of March 3, 2005, pp. 120 and 125 (direct), <u>with</u> State Rec., Vol. 12 of 72, transcript of March 3, 2005, p. 136 (redirect).  When questions on redirect do not involve a new matter, an opportunity for recross-examination is not required.  <u>See, e.g.</u>, <u>State v. Lyons</u>, 802 So. 2d 801, 806 (La. App. 5th Cir. 2001).
[73] Rec. Doc. 3-1, pp. 35-39.
[74] <u>Id.</u> at p. 36.
[75] State Rec., Vol. 26 of 72, Order dated September 17, 2008, p. 3.

specifically.[76]  His related writ applications were thereafter denied on the merits by both the Louisiana Fifth Circuit Court of Appeal[77] and the Louisiana Supreme Court,[78] again without this contention being specifically addressed.

For the following reasons, the undersigned finds that the state court decision denying petitioner relief based on this contention was not contrary to, and did not involve an unreasonable application of, clearly established federal law.  See 28 U.S.C. § 2254(d)(1).

In the original Report and Recommendation, it was noted that it was reasonable to assume that Logan would have invoked his Fifth Amendment right against self-incrimination since he had himself been charged in connection with Mr. Marrione's death and was awaiting his own trial.  In his Traverse and Reply to State's Response in Opposition to Granting Writ of Habeas Corpus,[79] petitioner essentially argues that it should not be simply **assumed** that Logan would have refused to testify.  He opines:  "Counsel failed to do a reasonable pretrial investigation to see if Mr. Logan would have any problems testifying and the record is devoid of any attempt by counsel to have a subpoena issued for Mr. Logan to testify at Petitioner's trial."[80]

However, even if that point is valid, it changes nothing.  If counsel did indeed fail to investigate whether Logan was willing to testify, that would impact only the "deficient performance" prong of the Strickland analysis.  But, as already explained, a petitioner must also establish that prejudice resulted – and, here, that requires that **petitioner prove** both that Logan **was willing testify and that he would have testified in a manner beneficial to petitioner**.  See

---

[76] State Rec., Vol. 61 of 72, Order dated August 20, 2020.
[77] Cambre v. Cain, No. 20-KH-382 (La. App. 5th Cir. Jan. 12, 2021); State Rec., Vol. 65 of 72.
[78] Cambre v. Cain, 331 So. 3d 916 (La. 2022); State Rec., Vol. 72 of 72.
[79] Rec. Doc. 22-1.
[80] Id. at p. 10.

Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010) ("We require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense."). Such "seemingly technical requirements" … '[are] not a matter of formalism.'" Hooks v. Thaler, 394 F. App'x 79, 83 (5th Cir. 2010) (quoting Woodfox, 609 F.3d at 808). And because petitioner presented **no evidence whatsoever** to meet those requirements, his contention that counsel was ineffective for failing to call Logan to testify necessarily fails. See, e.g., Cox v. Stephens, 602 F. App'x 141, 146 (5th Cir. 2015); Alexander v. Tanner, Civ. Action No. 19-9159, 2020 WL 6468611, at *13 (E.D. La. Sept. 29, 2020), adopted, 2020 WL 6449100 (E.D. La. Nov. 3, 2020).

### g.  Failure to Object to the Court's Failure to Question a Juror Concerning Her Fear of Retribution[81]

Petitioner contends that his counsel was also ineffective for failing to object to the trial court's failure to question a juror who expressed fears of retribution. In its final ruling in the state post-conviction proceedings, the state district court denied petitioner's ineffective assistance claim generally without addressing this contention specifically.[82] His related writ applications were then denied on the merits by both the Louisiana Fifth Circuit Court of Appeal[83] and the Louisiana Supreme Court,[84] again without this contention being specifically addressed. For the following reasons, the undersigned finds that the state court decision denying petitioner relief was not

---

[81] Rec. Doc. 3-1, pp. 39-42.
[82] State Rec., Vol. 61 of 72, Order dated August 20, 2020.
[83] Cambre v. Cain, No. 20-KH-382 (La. App. 5th Cir. Jan. 12, 2021); State Rec., Vol. 65 of 72.
[84] Cambre v. Cain, 331 So. 3d 916 (La. 2022); State Rec., Vol. 72 of 72.

contrary to, and did not involve an unreasonable application of, clearly established federal law.

See 28 U.S.C. § 2254(d)(1).

The trial transcript reflects that, after the defense's closing argument, the judge informed the prosecutor and defense counsel that a deputy had reported that one of the jurors, Ms. Faia, had been crying because she feared retribution by the parties.  In response, defense counsel stated:

> I think if the Court – you need to inquire, I mean, with her telling you her feelings, whether or not because of that she's not able to properly deliberate.  And if she says she can't, then we need to go to the alternate.  We're at that stage.  We can use an alternate at this point.[85]

The judge then questioned the reporting deputy as follows:

THE COURT:
> You're the one who talked to Ms. Faia?

DEP. BURMASTER:
> Yes, ma'am.

THE COURT:
> Okay.  Why don't you tell us what went on.

DEPUTY BURMASTER:
> We were coming around the back corner, and she made the comment to me that she had been crying since defense rested yesterday.  I said, well, I can't talk to you about anything about that.  She said, well, I've been crying all night.  I said, well, I said, just take a deep breath.  I said, I'm sure we are all exhausted and I was trying to just comfort her.  That was all that was said, because I tried to just blow it off.
> When Mr. Regan [defense counsel] started the last time, she was standing in front of the coffee machine right here in the hallway and she made the comment, she said, if I go – if I side with the defense, she said, then I have the J.P. and the D.A. looking down my neck.  And I held her hand, I said, I can't talk to you about that.  I said, just take a deep breath.  I said, just leave it alone.  Then she just continued.  She said if I side with the State, she said, I'm worried about repercussions.  And I tried to comfort her as much and I can, but I can in here [sic] eye contact that she is just – she's not going to stop thinking about it.

---

[85] State Rec., Vol. 23 of 72, transcript of March 12, 2005, p. 111.

And, I mean, I know that everybody's come along two weeks. That's why I brought it to your attention, because, I mean –

THE COURT:

I know. I appreciate it.

DEP. BURMASTER:

I tried to comfort her because they are all at a point now where just physically and mentally exhausted. And I try to comfort them, you know, just try to change the subject, get their minds on something else. But with her, it always comes back to the same thing, especially today. And Ms. Faia and the red headed lady – I don't know everybody's names yet – they are always, always, you know, together in the bathroom, in the jury room. So I don't know – you know – when I'm with them, they're always, you now, I mean, together.

But that was the extent of it.[86]

At that point, the judge and counsel discussed how to proceed, as follows:

MR. JORDAN [a prosecutor]:

Your Honor, I really – I mean, it's emotional and really I don't see any cause challenge for that juror at this point, I mean, I really don't. I wish I could make a suggestion to the Court – there's nothing the State can suggest other than as a juror, it's an emotional trial. It's two weeks long. They're probably frayed, like everybody is. But I don't think there's anything else I can –

THE COURT:

If she was afraid of one side, one or the other, I would be concerned. But she's afraid from both.

MR. REGAN:

Would the Court consider at this point just interviewing her and seeing if she's concerned about freely deliberating this case. And if she says she is, then if she can't freely deliberate, then we should go to the alternate.

THE COURT:

And what if I lose her and her friend? Then we are up, you know what creek, without a paddle.

MR. REGAN:

Well, the point is, that's why we have two. And we could get to the next one at this point, rather than keep someone who is afraid to freely deliberate. And I think we need people – in fact I just said. I need everybody to –

---

[86] Id. at pp. 112-13.

THE COURT:

      Well, go ahead. I'm going to let you finish. And then I'm going to tell you –

MR. REGAN:

      I just need everybody on. I think – I would ask the court at this point to interview her and see if in fact she would – she is still able to freely deliberate. And if she feels that she can't, then I would ask that we go to the alternate.

THE COURT:

      Well, I'll bet you I've got everybody back there who doesn't want to deliberate, number one; now that they are down to the nitty gritty, at this point in time. And let me tell you what my hope is, because I really believe that this comes up more than we know, and the other folks back there will deal with it, with her and tell her –

MR. JORDAN:

      Comfort her, or whatever it is.

THE COURT:

      – you know, this is our job to do and we can't let that influence us. I mean, I'm hoping that's what will occur.

      So my thoughts are at this point is to let it go. If they come out and tell me at some point in time during the deliberations that she can't, then we'll have to do what we have to do. But like Debbie [Dep. Burmaster] said, she and the other woman is inseparable. And if one finds out that one is gone, then the other is liable to use the same reason, and then we're really going to be you know where.

MR. REGAN:

      Well, but then we're assuming – we're assuming we're not in a problem right now. You know, that's what I'm saying. We're assuming that there is no problem. And I really think you need to interview her –

THE COURT:

      Well, I'm assuming that there is a problem. I'm assuming that it's a problem that I'm hoping that somebody else can take care of. And with – and that's the jury.

MR. JORDAN:

      Your Honor, the State would agree with the Court's suggestion because we have an alternate and during deliberations, that alternate will be sequestered during deliberations. So the State has no objection to the Court's response. I mean, if

every time a juror cried we took them out and started interviewing them, I think it would unduly influence the jury and the jury process, and the deliberation process.

MR. REGAN:
        It's her comments.

THE COURT:
        That's my concern, too.

MR. REGAN:
        Her comments.

THE COURT:
        Well, but except that she's equal.  She's not to one side or the other.  She's –

MR. REGAN:
        But her decision should not be based on fearing one thing or the other.  It should be making a decision based on the law and the facts.

THE COURT:
        And I'm going to make that real clear to them in the closing and she's got – she doesn't have just one.  She has two.

MR. REGAN:
        Would you include the fact that justice and of you've enforce the law if you find him not guilty.

THE COURT:
        It's in there.

MR. REGAN:
        Well, it's not in those words.  But, I mean, you know, folks, you are enforcing –

THE COURT:
        No, I don't want to add anything.

MR. BORDELON [a prosecutor]:
        And then the State would object to any wording that's –

THE COURT:

I don't want to add anything to that.[87]

In light of the foregoing, it was beyond cavil that defense counsel requested – repeatedly – that the Court directly question Ms. Faia about whether her fears would adversely affect her ability to deliberate but the presiding judge simply refused to do so at that point of the proceedings.  In his Traverse and Reply to State's Response in Opposition to Granting Writ of Habeas Corpus,[88] petitioner acknowledges as much but contends that his counsel was ineffective for not going one step further and formally objecting to the judge's action, opining:

> The State is correct that counsel requested numerous times that the trial court question the juror in question about her concerns relative to either voting guilty or not guilty.  Counsel's deficiency lies in failing to lodge an object [sic] on the record or request a mistrial to the trial court's refusal to question the juror about her fears in order to uncover any bias she may have.[89]

However, as explained in the original Report and Recommendation, it is clear that "[t]he failure to object generally falls within the ambit of trial strategy."  Sylve v. Cain, Civ. Action No. 14-1180, 2016 WL 4592135, at *5 (E.D. La. Sept. 1, 2016) (footnote and quotation marks omitted).  And, as already noted *supra*, courts generally are not to second-guess such tactical decisions.  See, e.g., Strickland, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential. ... [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (quotation marks omitted)).

---

[87] Id. at pp. 114-18.
[88] Rec. Doc. 22-1.
[89] Id. at p. 10.

Such second-guessing is particularly inappropriate here.  As the judge noted, and contrary to petitioner's contention otherwise, Ms. Faia's comments did not suggest that her fears caused her to favor one side more than the other – she feared **both** the prosecution and the defense. Moreover, Ms. Faia did not state that her fears might render her incapable of deliberating – and the judge made clear that she would revisit the issue and intervene if necessary if it came to pass that the deliberations were in fact being affected.  The judge's decision to proceed cautiously rather than to intervene immediately was understandable, especially given her reasonable concern that taking action prematurely might cause the loss of more jurors than there were alternates available for replacement.  Under these circumstances, defense counsel could legitimately and appropriately decide not to lodge a formal objection.

To the extent that petitioner is faulting his counsel for failing to move for a mistrial, that argument is even more misplaced.  In the first place, there were no grounds for a mandatory mistrial under Louisiana law.  <u>See</u> La. Code Crim. P. art. 770.[90]  In the second place, a decision as to whether to move for a mistrial is likewise one of trial strategy.  <u>See</u> <u>Hatch v. Lambert</u>, 215 F.

---

[90] Article 770 provides:

> Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
>
> (1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
> (2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
> (3) The failure of the defendant to testify in his own defense; or
> (4) The refusal of the judge to direct a verdict.
>
> An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.

La. Code Crim. P. art. 770.

App'x 614, 615 (9th Cir. 2006); <u>Brooks v. Cain</u>, Civ. Action No. 06-1869, 2009 WL 3088323, at *17 (E.D. La. Sept. 21, 2009); <u>Franklin v. Thompson</u>, Civ. Action No. 07-543, 2007 WL 3046642, at *12 (E.D. La. Oct. 17, 2007).  And, again, such strategic decisions of counsel are accorded a large measure of deference, and there is simply no reason that deference should not apply here.

The bottom line is this:  "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness."  <u>Garland v. Maggio</u>, 717 F.2d 199, 206 (5th Cir. 1983).  No such obvious unfairness resulted from counsel's decision not to object or move for a mistrial at this point in the proceeding, especially given the judge's express statement that the matter would be revisited if it became necessary to do so.

### h.  Failure to Move for a Change of Venue[91]

Petitioner's next contention in his federal application was that his counsel was ineffective for failing to move for a change of venue, arguing that a change was warranted because there had been "extensive pre-trial media coverage of this case" which resulted in a "prejudicial effect on a fair trial."[92]  However, in both his Objections to Magistrate's Report and Recommendation and Incorporated Memorandum and his Traverse and Reply to State's Response in Opposition to Granting Writ of Habeas Corpus, petitioner states that he wishes to abandon this contention.[93]  Therefore, this contention should be deemed abandoned, and no further discussion is required.[94]

---

[91] Rec. Doc. 3-1, pp. 42-43.
[92] <u>Id.</u> at p. 42.
[93] <u>See</u> Rec. Doc. 22, p. 16; Rec. Doc. 22-1, p. 11.
[94] In any event, if petitioner changes his mind once again in any objections he files to this Supplemental Report and Recommendation and requests that the contention be considered, the contention has no merit for the reasons explained in detail in the original Report and Recommendation.  <u>See</u> Rec. Doc. 19, pp. 36-39.

### i.  Failure to Move for a Mistrial Based Upon the

### State's Improper Reference to Petitioner's Post-Arrest Silence[95]

Petitioner next contends that his counsel was ineffective for failing to move for a mistrial when the prosecutor posed a question referencing petitioner's failure to make a statement to the police.  In one of its earlier rulings, the state district court expressly addressed and rejected that contention, stating:

> Petitioner argues that counsel was ineffective in failing to move for a mistrial after state made reference to post-arrest silence.  The state ceased questioning and defendant never answered the proposed question by the state, defendant was not prejudiced.  Petitioner fails to meet both the first and second prongs of Strickland. [FN 12]
>
> [FN 812]  Strickland v. Washington, supra.[96]

In its final ruling on petitioner's post-conviction application, the state district court then denied petitioner's ineffective assistance claim more generally without again addressing this contention specifically.[97]  His related writ applications were thereafter denied on the merits by both the Louisiana Fifth Circuit Court of Appeal[98] and the Louisiana Supreme Court,[99] again without this contention being specifically addressed.

For the following reasons, the undersigned finds that the state court decision denying petitioner relief based on this contention was not contrary to, and did not involve an unreasonable application of, clearly established federal law.  See 28 U.S.C. § 2254(d)(1).

---

[95] Rec. Doc. 3-1, pp. 43-45.

[96] State Rec., Vol. 26 of 72, Order dated September 17, 2008, p. 3.

[97] State Rec., Vol. 61 of 72, Order dated August 20, 2020.

[98] Cambre v. Cain, No. 20-KH-382 (La. App. 5th Cir. Jan. 12, 2021); State Rec., Vol. 65 of 72.

[99] Cambre v. Cain, 331 So. 3d 916 (La. 2022); State Rec., Vol. 72 of 72.

The trial transcript reflects that, during the state's cross-examination of petitioner at trial, the following exchange occurred:

Q.      Now at this point, July the 10th, when the police searched your residence, you had never given any statements to the police about what had happened to you; correct, with Kelly Marrione?

MR. REGAN:
        Judge, objection.  May we approach?

THE COURT:
        Come on up.

(Bench conference)

MR. REGAN:
        If I might speak.  If the District Attorney forces a mistrial under U.S. versus Edwards and Kennedy …

MR. JORDAN:
        … I withdraw the question.

MR. REGAN:
        … I will move to quash the indictment.  Asking my client if he made any statements to the police at this point, is absolutely reversible error.  And I'm not going to bite into moving for a mistrial at this point …

MR. JORDAN:
        … I'm going to withdraw the question.

THE COURT:
        Okay.

MR. JORDAN:
        I withdraw the question.

THE COURT:
        All right.  That question is withdrawn.[100]

---

[100] State Rec., Vol. 22 of 72, transcript of March 11, 2005, pp. 290-91.

The original Report and Recommendation concluded that even if defense counsel could have legitimately moved for a mistrial based on the prosecutor's question, he was not necessarily ineffective for choosing not to do so. Nothing in petitioner's Traverse and Reply to State's Response in Opposition to Granting Writ of Habeas Corpus[101] now warrants a different conclusion in this reconsideration.

For example, petitioner argues: (1) "It does not matter that counsel did not want a mistrial,"[102] and (2) "Realizing that an absolute reversible error occurred counsel was obligated to move for a mistrial in the matter to prevent his client from receiving and [sic] unfair trial."[103] But those arguments are simply incorrect, because such motions are made at **counsel's discretion**; and counsel may move for a mistrial – **or not** – based on his professional judgment. Indeed, "[i]t is oft-recognized that the decision not to seek a mistrial is frequently a strategic one," Geiger v. Cain, 540 F.3d 303, 309 (5th Cir. 2008), and, as already explained *supra*, such strategic decisions of counsel are accorded a large measure of deference.

Although petitioner argues that such deference is not warranted here because "[a]ny reasonable counsel subjecting the State case to meaningful adversarial testing would have requested a mistrial,"[104] that simply is not necessarily so. Instead, as noted in the original Report and Recommendation, the mere fact that a mistrial might be available does not mean that it is desirable, because mistrials do not invariably benefit the defense. Therefore, rather than reflexively moving for a mistrial at every opportunity, effective counsel must instead "balance the harm caused by [a] prosecutor's improper question against the legitimate possibility that a new

---

[101] Rec. Doc. 22-1.
[102] Id. at p. 12.
[103] Id. at p. 13.
[104] Id. at p. 12.

trial would present less propitious prospects for his client."  Ward v. Dretke, 420 F.3d 479, 491 (5th Cir. 2005).  For example, when a mistrial is declared and the case must be tried again from scratch, there is always a risk that in the new trial a less favorable jury might be empaneled or the state might bolster and present its case more effectively.  Therefore, defense counsel, who knows his case and was present for the trial, is generally in the best position to weigh the relative benefits of proceeding to a verdict against attempting to force a retrial by moving for mistrial.

A habeas court, whose knowledge of a case is limited to a cold record, should therefore second-guess trial counsel's decisions on such matters in only the most egregious circumstances.  This is not such a circumstance.  Here, defense counsel's objection was immediately sustained, the prosecutor's problematic question was not answered, and the question was immediately withdrawn.  Counsel's decision not to insist on a mistrial based on this one fleeting, unanswered question simply cannot be said to have permeated the entire trial with obvious unfairness, and so relief is not warranted.  See Garland v. Maggio, 717 F.2d 199, 206 (5th Cir. 1983) ("A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.").

Lastly, petitioner opines:  "More than likely counsel did not want a mistrial because of his earlier comments that he wasn't getting funds for Petitioner's second trial."[105]  That contention concerning counsel's motive is wholly speculative.  Moreover, the transcript does not support any such aspersions on counsel's professionalism.  On the contrary, the transcript reflects that counsel zealously represented petitioner throughout the multi-day trial – and any suggestion that counsel

---

[105] Id.

was simply "going through the motions" to hurriedly bring the case to a resolution by any means possible is both unwarranted and insulting.

### j.  Failure to Move for a Hearing Regarding a Juror's Fear of Petitioner[106] /

### k.  Waiver of Petitioner's Presence at Conference Concerning Juror's Fear of Petitioner[107]

At one point during trial, a bench conference was held to discuss several issues, and defense counsel waived petitioner's presence during that conference.  One of the issues discussed was that a juror had expressed to a bailiff her apprehension over the fact that petitioner was standing directly in front of the jury during certain demonstrations being presented during trial.[108]  For example, the transcript reflects the following exchange:

> THE COURT:
> ....
> We also have – there is one of the jurors who is very uncomfortable with your client being up there by them.  Very uncomfortable.
>
> MR. REGAN [defense counsel]:
> That's bad.
>
> THE COURT:
> Yes, it is.
>
> MR. REGAN:
> I mean, that is bad all the way around.  It's almost as an assumption at that point, that should not be there.
>
> THE COURT:
> No.  I think what we have are very naive people who don't know how to handle that kind of thing.  So we're going to have to do something about it. ...[109]

---

[106] Rec. Doc. 3-1, pp. 45-46.
[107] Id. at pp. 46-47.
[108] See State Rec., Vol. 16 of 72, transcript of March 6, 2005, pp. 121-28 and 133-35.
[109] Id. at pp. 121-22.

However, after more discussion, the juror's stated concerns were further clarified:

THE COURT:
     Wait a minute, counsel.  Let me readdress it.  Her problem was that there was no security around.  Not that he was there, but that there was no security.
     I'm sorry, Bob [the bailiff to whom the juror expressed the concern].  Thanks for –

MR. REGAN:
     Well, you know, the assumption he's not guilty, and we're supposed to minimize the appearance of security, if anything else.

THE COURT:
     And we try that very hard.[110]

Ultimately, it was agreed that the issue could be resolved by moving the jurors to a slightly different location in the courtroom for the demonstrations.  The jurors would be told that the move was being made simply to give them a better view,[111] and the bailiff would discretely inform the concerned juror that the judge was comfortable with the courtroom security.[112]

In the post-conviction proceedings, petitioner then contended that counsel that was ineffective for (1) failing to move the trial court to hold a hearing to explore the juror's fears and (2) waiving petitioner's presence at the aforementioned bench conference.  In one of its earlier rulings, the state district court expressly addressed and rejected those contentions, stating:

     Petitioner argues that counsel was ineffective by in [sic] failing to move for a hearing regarding a juror's concern with courtroom security, and in waiving petitioner's presence in a conference regarding juror's concern.  As the state points out, the juror had concerns regarding security in the courtroom, and not with the defendant's presence.  No hearing was warranted by the court.  The Fifth Circuit addressed petitioner's presence at the bench conference, and found no deficiency.  Additionally, petitioner fails to show any prejudice resulting from his absence at the bench conference.[FN 13]  The court sees no merit to these claims.

---

[110] Id. at p. 123.
[111] Id. at pp. 127-28.
[112] Id. at pp. 133-35.

[FN 12]  <u>Strickland v. Washington</u>, supra.[113]

In its final ruling on petitioner's post-conviction application, the state district court then denied his ineffective assistance claim more generally without again addressing these contentions specifically.[114]  His related writ applications were thereafter denied on the merits by both the Louisiana Fifth Circuit Court of Appeal[115] and the Louisiana Supreme Court,[116] again without these contentions being specifically addressed.

In the original Report and Recommendation, the undersigned found that the state court decision denying petitioner relief based on these contentions was not contrary to, and did not involve an unreasonable application of, clearly established federal law.  <u>See</u> 28 U.S.C. § 2254(d)(1).  Nothing in petitioner's Traverse and Reply to State's Response in Opposition to Granting Writ of Habeas Corpus[117] warrants a different conclusion in this reconsideration.

Rather, as to the contention that defense counsel was ineffective for failing to move for a hearing to further explore the juror's concerns, petitioner is, once again, asking this Court to second-guess a strategic decision made by his counsel.  But, once again, the Court should decline the invitation.  Without more, a juror's concern about courtroom security simply is not indicative of a bias against a defendant or of an inability or unwillingness to reach a just verdict.

Moreover, in any event, there is no reason to believe that the judge would have granted such a hearing in this case, even if one had been requested.  This is especially true given that the jurors had already undergone and survived voir dire concerning their ability and willingness to

---

[113] State Rec., Vol. 26 of 72, Order dated September 17, 2008, p. 3.
[114] State Rec., Vol. 61 of 72, Order dated August 20, 2020.
[115] <u>Cambre v. Cain</u>, No. 20-KH-382 (La. App. 5th Cir. Jan. 12, 2021); State Rec., Vol. 65 of 72.
[116] <u>Cambre v. Cain</u>, 331 So. 3d 916 (La. 2022); State Rec., Vol. 72 of 72.
[117] <u>See</u> Rec. Doc. 22-1, pp. 13-14.

follow the law and reach an unbiased verdict, and they would again be instructed of their obligations in that regard at the end of trial.

For these reasons, counsel was not deficient in failing to request such a hearing, and petitioner certainly has not established that he was in fact prejudiced by counsel's decision.

The related contention that counsel was ineffective for waiving petitioner's presence at the bench conference is no stronger. As the Louisiana Fifth Circuit Court of Appeal explained in petitioner's direct appeal, Louisiana law did not require his presence at the bench conference:

> We find that defendant's presence was not required for this bench conference concerning a juror's discomfort with courtroom security. LSA-C.Cr.P. art. 831 provides that a defendant shall be present at the calling, examination, challenging, impaneling, and swearing of the jury, and at any subsequent proceedings for the discharge of the jury or of a juror. At the time of this bench conference, the jury was already sworn in and at no time did the bench conference address the discharge of this juror. Further, defendant's presence was waived at the time of the first bench conference on this matter. The second bench conference took place after the defendant entered the courtroom.
> "There is no jurisprudence, or specific statutory provision that requires the defendant's presence at a bench conference in order to satisfy Article 831." State v. Williams, 34,359 (La.App. 2 Cir. 5/9/01), 786 So.2d 203, 212, writ denied, 01-2275 (La. 5/10/02), 815 So.2d 835 (citing State v. Wesley, 33,402 (La.App. 2 Cir. 5/10/00), 759 So.2d 286, writ denied, 00-1702 (La. 4/12/01), 788 So.2d 1201; State v. Glover, 93-959 (La.App. 5 Cir. 3/29/94), 636 So.2d 976, writ denied, 94-1460 (La. 9/3/96), 678 So.2d 544, writ granted in part and remanded, 97-1474 (La. 12/19/97), 704 So.2d 242).[118]

Federal law likewise did not require his presence. The United States Supreme Court has explained:

> The Court has assumed that, even in situations where the defendant is not actually confronting witnesses or evidence against him, he has a due process right to be present in his own person whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge. Although the Court has emphasized that this privilege of presence is not guaranteed when presence would be useless, or the benefit but a shadow, due process clearly requires

---

[118] State v. Cambre, 939 So. 2d 446, 458-59 (La. App. 5th Cir. 2006); State Rec., Vol. 41 of 72.

> that a defendant be allowed to be present **to the extent that a fair and just hearing would be thwarted by his absence**. Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome **if his presence would contribute to the fairness of the procedure**.

Kentucky v. Stincer, 482 U.S. 730, 745 (1987) (emphasis added; citations and quotation marks omitted). Here, petitioner simply has not shown that (1) his presence "would have been useful in ensuring a more reliable determination" or (2) he "could have done anything" – or "gained anything" – if he had attended. See id. at 747 (quotation marks and brackets omitted). Accordingly, it cannot be said that the Due Process Clause was violated merely because he was absent. See id. at 747.

In light of the foregoing, the undersigned once again finds that (1) counsel was not deficient for waiving petitioner's presence at a bench conference he had no right to attend and (2) petitioner has not shown that he was prejudiced by the waiver.

### l.  Failure to Move for a Mistrial on the Grounds that Significant Portions of the Voir Dire Had Not Been Recorded[119] / m.  Waiver of Petitioner's Presence at the Recreation of Unrecorded Voir Dire[120]

Due to an error, a portion of the voir dire proceedings was not recorded. When that fact was discovered, the record was recreated at defense counsel's suggestion with him expressly waiving petitioner's presence during that recreation.[121]  Both defense counsel and the prosecutor agreed that the recreation accurately reflected what had transpired.[122]

---

[119] Rec. Doc. 3-1, pp. 47-49.
[120] Id. at pp. 49-51.
[121] State Rec., Vol. 10 of 72, transcript of March 3, 2005, p. 4.
[122] Id. at p. 12.

On direct appeal, petitioner asserted claims concerning the foregoing events, arguing that recreated record failed to accurately reflect that a challenge for cause had been made and denied. The Louisiana Fifth Circuit Court of Appeal denied the claims, holding:

> Defendant argues that the defense was forced to use a peremptory challenge to back strike juror Donna Braud[FN 14] after the trial court denied defense's challenge for cause. Defendant contends that this portion of voir dire was not recorded and at a re-creation hearing pertaining to this matter defense counsel provided that this juror was acceptable by the defense instead of noting the challenge. Defendant argues that defendant's presence was required for voir dire and that, had defendant been present for the re-creation hearing, he would have had the opportunity to correct this.
>
>> [FN 14] It is noted that this juror's last name is also spelled "Breaux" in the record.
>
> The State responds that defendant's presence was not required at the hearing. The State further argues that it was defense counsel who suggested that the jury selection record be re-created and that prejudice has not been demonstrated. The State contends that even if defendant's presence was required, not only was defendant's presence waived, but defense counsel failed to object to defendant's absence and, therefore, review of this matter has been waived.
>
> On March 2, 2005, a jury was selected in this case. However, when jury selection was completed, it was discovered that the court reporter had run out of paper and the recording machine was not on for group number one; therefore there was no record for this portion of the jury selection except for what was contained in the notes and in the minute entry.[FN 15] On the following day, defense counsel suggested that what they needed to do with the record was to go back and try to re-create it. He provided that he could not ultimately waive anything but thought they could reasonably re-create what was done with the court reporter. The court agreed. Defense counsel provided that his client was not there, but he waived his presence. The court provided that they would try to re-create on the record what was done with group number one. When re-creating what occurred with Donna Braud, it was provided that she was acceptable by the State and defendant. Thereafter, the court asked if anyone had any disagreement and defense counsel responded: "As counsel on behalf of the defense, I believe that accurately reflects what had transpired at that time." The State agreed.
>
>> [FN 15] We note that pursuant to proper procedure, the court report should manually take down all proceedings, including voir dire, and operate the recording machine as a back-up device.

For the prosecution of a felony, Louisiana Code of Criminal Procedure article 831 dictates when a defendant shall be present, providing, in pertinent part,

A.  Except as may be provided by local rules of court in accordance with Articles 522 and 551, a defendant charged with a felony shall be present:

(1) At arraignment;
(2) When a plea of guilty, not guilty, or not guilty and not guilty by reason of insanity is made;
(3) At the calling, examination, challenging, impanelling, [sic] and swearing of the jury, and at any subsequent proceedings for the discharge of the jury or of a juror;
(4) At all times during the trial when the court is determining and ruling on the admissibility of evidence;
(5) In trials by jury, at all proceedings when the jury is present, and in trials without a jury, at all times when evidence is being adduced; and
(6) At the rendition of the verdict or judgment, unless he voluntarily absents himself.

However, the Louisiana Supreme Court has recognized that the provisions of LSA-C.Cr.P. art. 831 are not absolute.  State v. Broaden, 99-2124 (La. 2/21/01), 780 So.2d 349, 360, cert. denied, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001).  A defendant may waive his presence by voluntary absence pursuant to LSA-C.Cr.P. art. 832 or by not objecting to his absence from an article 831 A(3) hearing, as is required under the general contemporaneous objection rule to preserve the matter.  Id. (citing LSA-C.Cr.P. art. 841; State v. Taylor, 93-2201 (La. 2/28/96), 669 So.2d 364, 367-369, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996)).[FN 16]  However, as noted in the comments to LSA-C.Cr.P. art. 832, this voluntary absence waiver provided for by article 832 is limited to noncapital cases.

[FN 16]  LSA-C.Cr.P. art. 841(A) provides, in pertinent part, that an irregularity or error cannot be availed of after the verdict unless it was objected to at the time of the occurrence.

As provided by the Louisiana Supreme Court in the capital case of State v. Brown, 03-0897 (La. 4/12/05), 907 So.2d 1, 14, "[a]lthough this Court has ruled that a defendant may 'waive' his right to be present in a non-capital case, it has never ruled that a defendant in a capital case may absent himself during the key phases of the trial specified in La. C. Cr. P. art 831." (citation omitted).  However, the court in that case found that a criminal defendant is not entitled to be present at a pre-trial status hearing.

In the present case, we fail to find that defendant's presence was required at the hearing to re-create the record. LSA-C.Cr.P. art. 831 does not provide that a defendant is required to be present at such an event, and we find this hearing was not a key phase of trial. Although LSA-C.Cr.P. art. 831 A(3) provides that a defendant charged with a felony shall be present at the calling, examination, challenging, impaneling, and swearing of the jury, and at any subsequent proceedings for the discharge of the jury or of a juror, the minute entry in this case reflects that defendant was present for the actual jury selection which was not transcribed on March 2, 2005.

Moreover, defense counsel explicitly waived defendant's presence during the re-creation and therefore failed to preserve this issue for review. See, State v. Brown, supra at 14 (citations omitted). The record reflects that it was defense counsel's suggestion to re-create the record for the missing portion of the jury selection. At no time did defense counsel object to the re-creation, and instead acknowledged that it was an accurate reflection of what had taken place the day before.

In State v. Sherman, 630 So.2d 321, 322 (La.App. 5 Cir.1993), writ denied, 94-0258 (La. 5/6/94), 637 So.2d 1046, the defendant was convicted of second degree murder. On appeal, the defendant argued that the trial court erred in permitting the examination and discharge of potential jurors outside of his presence. Id. at 325. During jury selection, numerous potential jurors were examined, challenged and excused during bench conferences or in chambers outside of defendant's presence. Id. However, defense counsel failed to make a contemporaneous objection to the defendant remaining seated at counsel table while parts of the jury selection were conducted in the defendant's absence. Id. As such, this Court concluded that because defense counsel failed to make a contemporaneous objection as required by LSA-C.Cr.P. art. 841(A), the defendant was precluded from raising the issue on appeal. Id.

It is noted that the potential juror in question, Donna Braud, did not serve on the jury. Further, the March 2, 2005 minute entry does provide that defense challenged her for cause, it was denied by the court, defense's objection was noted, she was accepted and then backstricken by the defense.

This assignment of error is without merit.[123]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning

additional reasons.[124]

---

[123] State v. Cambre, 939 So. 2d 446, 454-56 (La. App. 5th Cir. 2006); State Rec., Vol. 41 of 72.
[124] State v. Cambre, 954 So. 2d 158 (La. 2007); State Rec., Vol. 67 of 72.

In the state post-conviction proceedings, petitioner then repackaged his contentions as part of his ineffective assistance of counsel claim. In its final ruling on the post-conviction application, the state district court denied petitioner's ineffective assistance claim generally without addressing those contentions specifically.[125] Petitioner's related writ applications were then likewise denied on the merits by both the Louisiana Fifth Circuit Court of Appeal[126] and the Louisiana Supreme Court,[127] again without these contentions being specifically addressed.

Petitioner then reurged his contentions in this federal application. However, in the original Report and Recommendation, the undersigned found that the state court decision denying petitioner relief based on the contentions was not contrary to, and did not involve an unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d)(1). And nothing in petitioner's Traverse and Reply to State's Response in Opposition to Granting Writ of Habeas Corpus,[128] which simply reurged arguments already considered and discredited, warrants a different conclusion in this reconsideration.

Petitioner's contention that his counsel was ineffective for failing to move for a mistrial on the grounds that the portion of the voir dire proceedings had not been recorded[129] once again challenges counsel's trial strategy. However, as explained earlier in this opinion, strategic decisions must be accorded a large measure of deference. Moreover, such deference is particularly appropriate with respect to counsel's decision on this issue. Here, by the time the error was discovered, jury selection was already complete.[130] If defense counsel had successfully moved for

---

[125] State Rec., Vol. 61 of 72, Order dated August 20, 2020.
[126] Cambre v. Cain, No. 20-KH-382 (La. App. 5th Cir. Jan. 12, 2021); State Rec., Vol. 65 of 72.
[127] Cambre v. Cain, 331 So. 3d 916 (La. 2022); State Rec., Vol. 72 of 72.
[128] See Rec. Doc. 22-1, pp. 14-15.
[129] Rec. Doc. 3-1, pp. 47-49.
[130] At trial, the judge stated:

a mistrial, then a new jury – which might be less favorable to the defense – would have to be empaneled. One can reasonably assume that defense counsel was satisfied with the jury selected and did not want to take that risk, given that it was he who actually proposed the idea simply to recreate the record and move forward. This Court has no valid reason to now second-guess that tactical decision and substitute its judgment for that of the very person who actually selected the jury.

Petitioner's contention that counsel was ineffective for waiving petitioner's presence for the recreation is no better. As already discussed *supra*, defense counsel generally may waive a defendant's presence unless his absence would undermine the fundamental fairness of the proceeding. Here, petitioner was present for the actual voir dire proceeding, and the judge, prosecutor, and defense counsel all agreed that the recreation accurately reflected what had occurred. Given those considerations, the undersigned cannot say that petitioner's mere absence from the recreation of the record rendered this proceeding unfair. Petitioner has not established that counsel's performance in this respect was deficient or that actual prejudice resulted.

---

This is Thursday morning, the 3rd of March. **Just let the record reflect that we found out yesterday after we had gone through the challenges of group number 1, that the recorder was not on for the – the tape recorder. I assumed, and was not told anything more – I assumed he was doing his stenographing at the time – told counsel that the tape recorder was not on, and actually did not find out that he was not stenographing at the time, either, until we completed selecting the jury last night.**
He indicated that he had run out of paper and the recording machine wasn't on. So we have no record of what went on other than Janet's minute entry and all of our notes.

State Rec., Vol. 10 of 72, transcript of March 3, 2005, pp. 5-6 (emphasis added).

### n.  Failure to Subpoena Telephone Records[131] / o.  Failure to Investigate the Location of the Missing Weapons[132] / p.  Failure to Timely Retain an Investigator to Substantiate Defense Accusations that Victim Fixed Tickets for Money[133]

Petitioner next contends that counsel was ineffective for failing to adequately investigate the case.  In its final ruling on the post-conviction application, the state district court denied petitioner's ineffective assistance claim generally without addressing those contentions specifically.[134]  His related writ applications were then likewise denied on the merits by both the Louisiana Fifth Circuit Court of Appeal[135] and the Louisiana Supreme Court,[136] again without the contentions being specifically addressed.

Petitioner then reurged his contentions in his federal application.  However, in the original Report and Recommendation, the undersigned found that the state court decision denying petitioner relief based on the contentions was not contrary to, or did not involve an unreasonable application of, clearly established federal law.  See 28 U.S.C. § 2254(d)(1).  Again, nothing in petitioner's Traverse and Reply to State's Response in Opposition to Granting Writ of Habeas Corpus[137] warrants a different conclusion in this reconsideration for the following reasons.

With respect to contentions challenging the adequacy of counsel's investigations, the United States Fifth Circuit Court of Appeals has explained:

> In general, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  A particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.  An attorney must engage in a reasonable amount of pretrial investigation and at a

---

[131] Rec. Doc. 3-1, pp. 51-52.
[132] Id. at pp. 52-54.
[133] Id. at p. 54.
[134] State Rec., Vol. 61 of 72, Order dated August 20, 2020.
[135] Cambre v. Cain, No. 20-KH-382 (La. App. 5th Cir. Jan. 12, 2021); State Rec., Vol. 65 of 72.
[136] Cambre v. Cain, 331 So. 3d 916 (La. 2022); State Rec., Vol. 72 of 72.
[137] Rec. Doc. 22-1.

> minimum, interview potential witnesses and make an independent investigation of the facts and circumstances in the case. …
>
>     We have explained the prejudice standard in such cases this way:  "A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial."

Adekeye v. Davis, 938 F.3d 678, 682-83 (quoting United States v. Green, 882 F.2d 999, 1003 (5th Cir. 1989)) (footnotes, quotation marks, brackets, and ellipses omitted).  However, where, as here, the state courts have denied such a claim on the merits, federal habeas relief is warranted only if the petitioner shows that the state court's denial was unreasonable.  See id. at 683-84.  And a petitioner can make that showing only by pointing to "concrete evidence" – a petitioner's conclusory allegations alone will not suffice.  Id. at 684 & n.35; Ross v. Estelle, 694 F.2d 1008, 1011-12 (5th Cir. 1983) ("Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his *pro se* petition (in state and federal court), unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value.  We are thus bound to re-emphasize that mere conclusory allegations do not raise a constitutional issue in a habeas proceeding." (citation and footnote omitted)).  As explained below, any such evidence is lacking here.

Petitioner's first contention was that counsel was ineffective for failing to obtain the telephone records for a pager number purportedly used in connection with the victim's alleged criminal scheme to fix traffic tickets.  In his federal application, petitioner opined that "[a]scertaining the owner of this pager was vital to support [petitioner's] assertion that it was the contact number provided by Marrione"[138] – a fact which, if proven, would lend credence to

---

[138] Rec. Doc. 3-1, p. 51.

petitioner's contention that the shooting in this case arose not from a robbery attempt but instead from a dispute regarding the fixing of petitioner's traffic tickets.

However, the original Report and Recommendation found that this contention failed for lack of supporting evidence.  Specifically, petitioner had not produced the telephone records in question, and he could not prove his claim without that evidence.  Put differently, he had no proof that the records would in fact have tied the pager to Mr. Marrione, and neither the state court nor this federal court could simply accept his mere allegation on that issue.  Nothing in either petitioner's Objections to Magistrate's Report and Recommendation and Incorporated Memorandum[139] or his Traverse and Reply to State's Response in Opposition to Granting Writ of Habeas Corpus[140] addressed or corrected that fatal flaw.

Petitioner's second contention was that counsel was ineffective for "failing to conduct an investigation into the missing weapons" used in the shooting.[141]  However, in both his Objections to Magistrate's Report and Recommendation and Incorporated Memorandum and his Traverse and Reply to State's Response in Opposition to Granting Writ of Habeas Corpus, petitioner states that he wishes to abandon this contention.[142]  Therefore, that second contention should be deemed abandoned, and no further discussion is required.[143]

Petitioner's third contention was that counsel was ineffective for failing to "timely retain" an investigator to substantiate petitioner's allegation that the victim fixed tickets for money.

---

[139] See Rec. Doc. 22, pp. 21-22.
[140] See Rec. Doc. 22-1, pp. 16-17.
[141] Rec. Doc. 3-1, p. 52.
[142] Rec. Doc. 22, p. 22; Rec. Doc. 22-1, p. 17.
[143] In any event, if petitioner changes his mind in any objections he files to this Supplemental Report and Recommendation and requests that the contention be considered, the contention has no merit for the reasons explained in detail in the original Report and Recommendation.  See Rec. Doc. 19, pp. 54-56.

However, the original Report and Recommendation found that the transcript reflected that defense counsel did have an investigator, Keith Lobrano,[144] and there was no evidence that Lobrano was not retained in a "timely" manner.  Further, it noted that petitioner had presented no evidence as to the scope and nature of Lobrano's investigations – therefore, there was no proof that the purported ticket-fixing scheme was not among the issues he investigated.

Lastly, to the extent that petitioner was alleging that there was available evidence of the purported scheme that Lobrano could (and should) have uncovered during his investigations, it was noted that petitioner had once again failed to meet his burden of proof.  Instead, he merely suggested that the United States Attorney had such evidence, although the evidence was sealed.[145] But because petitioner had not presented a copy of that evidence, neither the state court nor this federal court (or, for that fact, petitioner himself) could actually know what that evidence would in fact show – and that effectively ended the matter.

Again, nothing in either petitioner's Objections to Magistrate's Report and Recommendation and Incorporated Memorandum[146] or his Traverse and Reply to State's Response in Opposition to Granting Writ of Habeas Corpus[147] addressed or corrected those fatal flaws.  Further, as explained in the original Report and Recommendation, the flaws could not be remedied even if petitioner could now obtain the missing evidence.  It is simply too late for the purposes of this federal proceeding.  Where, as here, the state courts have denied a petitioner's claim on the merits, a federal court is limited to reviewing **only** the evidence presented to the state courts.  Because petitioner did not have and therefore did not present this supposed evidence to

---

[144] See State Rec., Vol. 18 of 72, transcript of March 8, 2005, p. 27.
[145] Rec. Doc. 3-1, p. 54.
[146] See Rec. Doc. 22, pp. 22-23.
[147] See Rec. Doc. 22-1, pp. 17-18.

the state courts, this Court could not consider it now in the first instance.  See Cullen v. Pinholster,

563 U.S. 170, 181-82 (2011) ("[R]eview under § 2254(d)(1) is limited to the record that was before

the state court that adjudicated the claim on the merits.  Section 2254(d)(1) refers, in the past tense,

to a state-court adjudication that 'resulted in' a decision that was contrary to, or 'involved' an

unreasonable application of, established law.  This backward-looking language requires an

examination of the state-court decision at the time it was made.  It follows that the record under

review is limited to the record in existence at that same time *i.e.*, the record before the state court.").

### q.  Failure to Object to Scanlan's Testimony Regarding the Sequence of Shots[148] / r.  Failure to Adequately Cross-Examine Scanlan[149]

Petitioner next contends that counsel was ineffective for failing to object to Scanlan's

testimony concerning the sequence of the shots fired by Mr. Marrione on the grounds that the

testimony was inconsistent.  On cross-examination, Scanlan testified that he had "[n]o way of

knowing" the order in which the shots were fired.[150]  Petitioner argues that testimony was

inconsistent with Scanlan's testimony on redirect examination, during which, petitioner contends,

Scanlan seemingly gave an opinion on the sequence of the shots.[151]

Petitioner also contends that his counsel was also ineffective for failing to cross-examine

Scanlan regarding his notes indicating that he did not find two shell casings until the second day

of the investigation.[152]

Both of those contentions obviously challenge the manner in which defense counsel chose

to react to Scanlan's testimony.  However, such choices are inherently ones of counsel's

---

[148] Rec. Doc. 3-1, pp. 54-55.
[149] Id. at p. 55.
[150] State Rec., Vol. 17 of 72, transcript of March 6, 2005, pp. 236-37.
[151] State Rec., Vol. 17 of 72, transcript of March 7, 2005, pp. 201-05.
[152] Rec. Doc. 3-1, p. 55.

professional judgment and trial tactics.  For example, it is clear that "[t]he decision whether to cross-examine a witness, and if so, how vigorously to challenge the witness' testimony, requires a quintessential exercise of professional judgment."  Ford v. Cockrell, 315 F. Supp. 2d 831, 859 (W.D. Tex. 2004), aff'd, 135 F. App'x 769 (5th Cir. 2005); accord Lewis v. Cain, Civ. Action No. 09-2848, 2009 WL 3367055, at *8 (E.D. La. Oct. 16, 2009), aff'd, 444 F. App'x 835 (5th Cir. 2011); Williams v. Cain, Civ. Action Nos. 06-0224 and 06-0344, 2009 WL 1269282, at *11 (E.D. La. May 7, 2009), aff'd, 359 F. App'x 462 (5th Cir. 2009); Packnett v. Cain, Civ. Action No. 06-5973, 2008 WL 148486, at *11 (E.D. La. Jan. 10, 2008); Parker v. Cain, 445 F. Supp. 2d 685, 710 (E.D. La. 2006).  But, as already noted repeatedly herein, the United States Supreme Court has cautioned courts not to second-guess counsel's decisions on such tactical matters through the distorting lens of hindsight; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy.  Strickland, 466 U.S. at 689.  Again, petitioner has not persuasively rebutted that presumption here.

For example, with respect to petitioner's contention concerning the sequence of Mr. Marrione's five shots, it is not clear that Scanlan's testimony was in fact inconsistent.  Rather, petitioner's contention is based on a flawed underlying premise.  Specifically, petitioner posits that when Scanlan was referencing, for example, the "first shot" or "Shot 1" in his testimony, he was referring to the bullet that was **fired** first.  But he was not.  The fact that the term "first shot" was not synonymous with "first shot fired" is clear from the following exchange between defense counsel and Scanlan on cross-examination:

> Q.    Hand shot.  Okay.  Then let's go to the third bullet.  We're going to go back and touch on each one.  The third shot, the fourth shot, the fifth shot.  Now, first of

all, do you, from your objective science, **can you tell me whether the first shot**, second, short, third shot, fourth shot or fifth shot **was first**?  **Which one went first**?

A.      **Well, there's no way of knowing**. …

….

Q.      … Which one – which one was shot first?

A.      In relation to all five, I can't put them in order. …[153]

When understood in that same manner, Scanlan's testimony on redirect examination is not inconsistent.[154]  When, for example, Scanlan refers on redirect examination to the "first shot," he apparently means the first physical bullet being discussed, not the first shot actually fired.

Moreover, in any event, the sequence of Mr. Marrione's five shots was of little, if any, importance.  The critical question to petitioner's claim of self-defense was **who** fired first, Mr. Marrione or the perpetrators.  And, as noted previously, Scanlan was able to reach the conclusion (based on Connie Fossier's testimony) that one of the perpetrators fired first.  But once that first shot was fired, the sequence of the remaining shots was immaterial for the purposes of this case.

As to the contention that counsel was ineffective for failing to cross-examine Scanlan utilizing the information contained in his notes, that relies on an unproven premise – namely, that counsel had seen Scanlan's notes.  But petitioner candidly admits that he does know whether those notes had been provided to defense counsel.[155]  If, as petitioner concedes is possible, defense counsel had never seen the notes or was unaware of their existence, then he cannot possibly have

---

[153] State Rec., Vol. 17 of 72, transcript of March 6, 2005, pp. 236-37 (emphasis added).
[154] State Rec., Vol. 17 of 72, transcript of March 7, 2005, pp. 201-05.
[155] Rec. Doc. 3-1, p. 55.

been ineffective for failing to impeach or cross-examine Scanlan based on the content of those notes.

Because nothing in either petitioner's Objections to Magistrate's Report and Recommendation and Incorporated Memorandum[156] or his Traverse and Reply to State's Response in Opposition to Granting Writ of Habeas Corpus[157] remedies the foregoing concerns highlighted in the original Report and Recommendation, no further discussion of these contentions is necessary or warranted.

## 2.  Incomplete Transcript[158]

Petitioner next claims that his rights to equal protection and due process were violated by the failure to provide him with a complete transcript of the trial proceedings.  He contends that the failure deprived him of his right to full appellate review.

However, on direct appeal, the Louisiana Fifth Circuit Court of Appeal held:

> Defendant argues that, because of the failure to record the voir dire of Juror Braud, it is impossible to review the trial court's denial of the Braud challenge for cause, putting defendant's conviction and life sentence beyond the reach of appellate review and denying his constitutional and statutory due process rights. Defendant argues that all of his peremptory challenges were used and, therefore, the trial court's error in failing to record voir dire was not harmless and the presumption of prejudice mandates reversal.
> The State responds that defendant did not object to re-creating the record as to the jury selection or request a mistrial and that it was defense counsel who suggested the re-creation.  Further, the State contends that only the challenges made on March 2, 2005 were unable to be transcribed and it appears the remainder of the jury selection was not transcribed due to the failure of defense counsel to request the transcription.  The State concludes that the re-creation should be sufficient for a meaningful review on appeal and that defendant failed to show prejudice.
> The Louisiana Supreme Court and the United States Supreme Court have made clear that a criminal defendant has a right to a complete transcript of the trial

---

[156] See Rec. Doc. 22, pp. 23-24.
[157] See Rec. Doc. 22-1, pp. 18-19.
[158] Rec. Doc. 3-1, pp. 55-57.

proceedings, in particular, where as here, appellate counsel was not counsel at trial. State v. Deruise, 98-0541 (La. 4/3/01), 802 So.2d 1224, 1234, cert. denied, 534 U.S. 926, 122 S.Ct. 283, 151 L.Ed.2d 208 (2001) (citations omitted). The interests of justice require that a defendant be afforded a new, fully recorded trial where a defendant's attorney is unable, through no fault of his own, to review a substantial portion of the trial record for errors so that he may properly perform his appellate counsel duties. State v. Ford, 338 So.2d 107, 110 (La. 1976).

In addition, the Louisiana Constitution guarantees a defendant the right of appeal "based upon a complete record of all the evidence upon which the judgment is based." State v. Deruise, 802 So.2d at 1234 (citing La. Const. art. I, § 19). As a corollary, LSA-R.S. 13:961(C) provides that, in criminal cases tried in the district courts, the court reporter shall record all portions of the proceedings required by law and shall transcribe those portions of the proceedings required. LSA-C.Cr.P. art. 843 provides, in pertinent part, that in felony cases, the clerk or court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders and charges by the court, and objections, questions, statements and arguments of counsel.

Although the Louisiana Supreme Court has found reversible error when material portions of the trial record were unavailable or incomplete, a "slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal" does not require reversal of a defendant's conviction. State v. Boatner, 03-0485 (La. 12/3/03), 861 So.2d 149, 153 (citations omitted). A defendant is not entitled to relief because of an incomplete record unless there is a showing of prejudice based on the missing portions of the transcript. Id. (citations omitted).

In State v. Jenkins, 02-161 (La.App. 5 Cir. 9/30/03), 857 So.2d 1185, writ denied, 04-2533 (La. 11/28/05), 916 So.2d 130, the defendant asserted that it was impossible to review the court's ruling of his motion to suppress because a portion of the transcript from the suppression hearing was missing. In Jenkins, the court reporter filed a letter into the record stating the last tape of the suppression hearing was lost and could not be transcribed. The trial court held a hearing to address the missing transcript in which one of the witnesses was available to testify. A portion of the cross-examination of this witness was missing. However, the defense counsel provided she had no questions for this witness that had not already been addressed on the record and did not object to the trial court's ruling regarding the missing transcript. As such, this Court concluded the defendant waived any objection to this portion of the missing transcript.

In State v. Plaisance, 00-1858 (La.App. 4 Cir. 3/6/02), 811 So.2d 1172, 1187-1188, writ denied, 02-1395 (La. 11/27/02), 831 So.2d 270, cert. denied, 538 U.S. 1038, 123 S.Ct. 2084, 155 L.Ed.2d 1071 (2003), the defendant argued that the record did not contain transcriptions of the general voir dire bench conferences during which both the State and the defense made peremptory strikes and challenges for cause. He argued that he was prejudiced by the absence of the bench

conference transcripts because his claim regarding the trial court's error in denying him the right to back-strike jurors, asserted in another assignment of error, could not be reviewed.  In Plaisance, although the record did not contain transcripts of the general voir dire bench conferences, a minute entry from the trial reflected that the trial court excused twenty-seven jurors for cause, that the defendant exercised seven peremptory challenges, and that the State exercised nine.

The Plaisance court provided that "the fact that the record does not contain transcripts of the general voir dire bench conferences does not automatically warrant reversal.  The defendant must demonstrate that he suffered specific prejudice as a result of those conferences not being transcribed."

We find that the missing portion of the trial record concerning jury selection is not evidentiary and, therefore, its absence does not compromise defendant's constitutional right to a judicial review of all evidence.  See, State v. Thomas, 92-1428 (La.App. 4 Cir. 5/26/94), 637 So.2d 1272, 1274, writ denied, 94-1725 (La. 11/18/94), 646 So.2d 376, cert. denied, 514 U.S. 1054, 115 S.Ct. 1437, 131 L.Ed.2d 317 (1995).

Defendant argues that because of the failure to record the voir dire of Juror Braud it is impossible to review the trial court's denial of the Braud challenge for cause putting defendant's conviction and life sentence beyond the reach of appellate review.  However, as in Jenkins, defense was given an opportunity to re-create the missing portion of the record and no objection was made regarding the missing transcript.  Following Jenkins, this Court concludes that defendant waived any objection to this portion of the missing transcript.

Further, we find that defendant is not entitled to relief because of the incomplete record, absent a showing of prejudice based on the missing portions of the transcripts.  As noted previously, Juror Braud did not serve on the jury and, assuming the minute entry is correct, was backstricken.[FN 17]

> [FN 17]  We also note that if this juror was so important to remove that a peremptory challenge would have been used at that time without a delay as evidenced from the backstrike, that the defense counsel would have remembered the problematic juror the following day at the re-creation hearing.

We also note that the minute entry could be incorrect.  Defense counsel and the State agreed the re-creation hearing was an accurate reflection of what took place the previous day during jury selection.  A transcript of the actual jury selection at that time was not recorded and cannot be transcribed.  As such, **the transcript established from the re-creation hearing stands as the substitute.  When there is a discrepancy between the minutes and the transcript, the transcript prevails.**  State v. Lynch, 441 So.2d 732, 734 (La. 1983).  **We find that according to the transcript, that is, the re-creation hearing agreed to by counsel, there was no challenge for this Court to review.**

This assignment of error is without merit.[159]

---

[159] State v. Cambre, 939 So. 2d 446, 456-58 (La. App. 5th Cir. 2006) (emphasis added); State Rec., Vol. 41 of 72.

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[160]

In its response in this federal proceeding, the state argued that this claim was both procedurally barred and failed on the merits.  However, the original Report and Recommendation declined to address the purported procedural bar because the claim failed on the merits for the following reasons.[161]

First, the Report and Recommendation noted that petitioner primarily relied on Louisiana law in his discussion of this claim.  However, if petitioner was arguing that the failure to provide him with a complete transcript violated rights guaranteed to him by Louisiana law, any such argument was misplaced in this federal proceeding.  Federal habeas corpus relief may be granted only to remedy violations of the Constitution and laws of the United States; **mere violations of state law will not suffice**.  28 U.S.C. § 2254; Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law." (quotation marks omitted)); Engle v. Isaac, 456 U.S. 107, 119 (1983); Bienemy v. Cain, Civ. Action No. 16-1967, 2017 WL 3393966, at *28 (E.D. La. July 18, 2017) ("[Petitioner] argues that the lack of a complete record of voir dire proceedings, closing argument, and particularly side bar and bench conferences, prevented him from exercising his right to full and complete appellate review.  To the extent he relies on Louisiana state-court precedent to suggest the state court erred in failing to comply with state law during voir dire proceedings, his claim provides no grounds for

---

[160] State v. Cambre, 954 So. 2d 158 (La. 2007); State Rec., Vol. 67 of 72.

[161] A federal court need not decide whether a claim is procedurally barred if the claim clearly fails on the merits. Glover v. Hargett, 56 F.3d 682, 684 (5th Cir. 1995); Wiley v. Puckett, 969 F.2d 86, 104 (5th Cir. 1992); Corzo v. Murphy, Civ. Action No. 07-7409, 2008 WL 3347394, at * 1 n.5 (E.D. La. July 30, 2008); Lee v. Cain, Civ. Action No. 06-9669, 2007 WL 2751210, at *9 (E.D. La. Sept. 18, 2007).

federal *habeas* relief." (footnote omitted)), <u>adopted</u>, 2017 WL 3382332 (E.D. La. Aug. 7, 2017),

<u>certificate of appealability denied</u>, No. 17-30669, 2018 WL 11443415 (5th Cir. Sept. 13, 2018).

Second, to the extent that petitioner was arguing that the failure to provide him with a

complete transcript violated rights guaranteed to him by the United States Constitution, the Report

and Recommendation rejected that argument, noting that federal law does not invariably demand

that a full, verbatim transcript be available to every criminal defendant.  To the contrary, the United

States Fifth Circuit Court of Appeals has explained:

> "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."  <u>Chambers v. Mississippi</u>, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Accordingly, "if a State has created appellate courts as 'an integral part of the ... system for finally adjudicating the guilt or innocence of a defendant,' the procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution."  <u>Evitts v. Lucey</u>, 469 U.S. 387, 393, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985) (alteration in original) (citation omitted) (quoting <u>Griffin v. Illinois</u>, 351 U.S. 12, 18, 76 S.Ct. 585, 100 L.Ed. 891 (1956)).  However, **"a complete verbatim transcript" is not always required to ensure that a defendant's right to meaningful appellate review is satisfied.**  <u>See</u> <u>Moore v. Wainwright</u>, 633 F.2d 406, 408 (5th Cir. 1980) ("[T]he state is not obligated to automatically supply a complete verbatim transcript."). Accordingly, **the record is "adequate for full appellate review" so long as it contains the portions necessary to address the alleged errors below.**  <u>Schwander v. Blackburn</u>, 750 F.2d 494, 497-98 (5th Cir. 1985) (quoting <u>State v. Francis</u>, 345 So.2d 1120, 1125 (La. 1977)).  Moreover, claims based on incomplete transcripts must show that "the absence of such a transcript prejudiced [the defendant's] appeal."  <u>Mullen v. Blackburn</u>, 808 F.2d 1143, 1146 (5th Cir. 1987).

<u>Higginbotham v. Louisiana</u>, 817 F.3d 217, 222 (5th Cir. 2016) (emphasis added).

Here, the Louisiana courts concluded that the record was adequate for review of the claim

that the trial court wrongly denied a defense challenge of Braud for cause.  Specifically, although

they noted that a minute entry stated that that defense made such a challenge and that challenge

was denied,[162] the transcript (albeit a "recreated" transcript which defense counsel stipulated was accurate) indicated that there was no such challenge, and, under Louisiana law, the transcript prevails when there is such a conflict.  See State v. Lynch, 441 So. 2d 732, 734 (La. 1983) (holding that when "there is a discrepancy between the minutes and the transcript, the transcript must prevail").  The Report and Recommendation therefore concluded that petitioner was, in essence, inviting this federal court to hold that, **contrary to the holdings of the Louisiana state courts**, the foregoing principle of **Louisiana law** applies only to a verbatim transcript and not to, as here, a "recreated" transcript.  But, as explained, the state courts – not the federal courts – are the final arbiters of state law.  See Levy Gardens Partners 2007, L.P. v. Commonwealth Land and Title Insurance Co., 706 F.3d 622, 629 (5th Cir. 2013) ("The principle that state courts are the final arbiters of state law is well-settled."); Dickerson v. Guste, 932 F.2d 1142, 1145 (5th Cir. 1991) ("We will not review a state court's interpretation of its own law in a federal habeas corpus proceeding. We do not sit as a 'super' state supreme court in such a proceeding to review errors under state law." (internal citation and quotation marks omitted)).  Because the state courts found that the transcript was adequate to address and resolve petitioner's appellate claim on the merits, the Report and Recommendation concluded that petitioner's argument on this point should be rejected for lack of prejudice.

It was noted that petitioner was perhaps also contending that there were other portions of the voir dire proceedings that, while properly recorded, simply were not transcribed and furnished to him for his use in his appeal.  If so, the Report and Recommendation found that contention to

---

[162] The minute entry states:  "197 – Donna B. Braud – Defense challenged for cause, denied by the Court, objection by defendant counsel noted, ACCEPTED, backstricken by the Defense."  State Rec., Vol. 1 of 72, minute entry dated March 2, 2005.

be meritless because petitioner's appeal asserted no other claims of error relating to the voir dire proceedings[163] – and a petitioner clearly has no federal constitutional right to transcripts of the portions of the proceedings not germane to the claims asserted on appeal.  See Kunkle v. Dretke, 352 F.3d 980, 985 (5th Cir. 2003) ("[A] State need not waste its funds providing for free those parts of the transcript that are not 'germane to consideration of the appeal.'") (quoting Draper v. Washington, 372 U.S. 487, 495 (1963)); Schwander v. Blackburn, 750 F.2d 494, 497-98 (5th Cir. 1985); Pollard v. Cain, Civ. Action No. 16-192, 2018 WL 3417851, at *5 (E.D. La. July 12, 2018), certificate of appealability denied, No. 18-30911, 2019 WL 13219616 (5th Cir. Mar. 14, 2019); Coleman v. Cain, Civ. Action No. 07-3655, 2014 WL 348541, at *20-21 (E.D. La. Jan. 3, 2014).

Lastly, the Report and Recommendation noted that if petitioner was perhaps contending that the untranscribed portions might have revealed **other** errors in the proceedings which would have given him grounds for additional claims for appeal, that contention was a nonstarter because the federal right in question simply does not extend that far.  On the contrary, it is clear that a state is not "state required to furnish complete transcripts so that the defendants may conduct 'fishing expeditions' to seek out possible errors at trial."  Kunkle, 352 F.3d at 985-86; accord Womack-Grey v. Warden, Louisiana Correctional Institute for Women, Civ. Action No. 08-3956, 2010 WL 3473081, at *8 (E.D. La. Apr. 14, 2010) ("Petitioner contends that a complete transcript is necessary so that she can look for errors.  However, it is well settled that the State is not required to furnish complete transcripts so that the defendants may conduct 'fishing expeditions' to seek out possible errors at trial.  The law also does not require a more complete transcript when a petitioner is completely unable to indicate one specific error committed during the portions of trial

---

[163] See State Rec., Vol. 25 of 72, Original Brief on Behalf of Appellant.

not included in the record." (citation, quotation marks, and ellipsis omitted)), <u>adopted</u>, 2010 WL 3473811 (E.D. La. Aug. 27, 2010).

Because, once again, nothing in either petitioner's Objections to Magistrate's Report and Recommendation and Incorporated Memorandum[164] or his Traverse and Reply to State's Response in Opposition to Granting Writ of Habeas Corpus[165] remedies the foregoing findings in the original Report and Recommendation, no further discussion of this claim is necessary or warranted.

### 3.  Ineffective Assistance of Appellate Counsel[166]

Petitioner next claims that his appellate counsel was ineffective for failing to request that the recorded portions of the voir dire proceeding be transcribed.  In its first ruling in the post-conviction proceedings on June 5, 2008, the state district court expressly addressed and denied that claim, holding:

> The petitioner complains of [sic] that the performance of his attorney on direct appeal, Bruce Whittaker, was constitutionally defective.  He first asserts that counsel was ineffective by failing to locate voir dire transcripts so that the court of appeal could review the proceedings.  As noted above, the underlying claim has been fully litigated.  Counsel did raise issues on appeal relative to the voir dire and therefore this complaint is factually unfounded.
>
> ….
> The burden of proof in an application for post-conviction relief is entirely on the petitioner.  LSA-C.Cr.P. art. 930.2.  The petitioner failed to meet his heavy burden of establishing ineffective assistance of counsel on appeal.  He has proven neither a deficient performance nor prejudice.  Without the establishment of ineffective assistance of counsel, he cannot blame his failure to raise issues on appellate counsel.  Contrary to the petitioner's complaints, this court finds that counsel on appeal was highly effective and diligent.  Appellate counsel is an experienced appellate advocate who skillfully raise appellate issues.  The fact that

---

[164] <u>See</u> Rec. Doc. 22, pp. 25-27.
[165] <u>See</u> Rec. Doc. 22-1, pp. 18 and 20.
[166] Rec. Doc. 3-1, pp. 57-59.

the Court of Appeal upheld the jury's verdict does not equate to a finding of deficient performance by appellate counsel.[167]

After that ruling was vacated as premature by the Louisiana Fifth Circuit Court of Appeal,[168] the state district court then again rejected the claim on January 9, 2020, similarly holding:

> The petitioner reiterates his argument that his appellate counsel was ineffective. The major portions of this claim have been reviewed and found lacking in the court's denial of post-conviction relief on June 5, 2008.
>
> In reviewing effective assistance of counsel claims on direct review, the Supreme Court of the United States has expressly observed that appellate counsel "need not advance every argument, regardless of merit, urged by the defendant.["] Evits v. Lucey, 469 U.S. 387, 394 (1985). The Court gives great deference to professional appellate strategy and applauds counsel for "winnowing out weaker arguments on appeal and focusing on one central issue if possible, and at most a few key issues.["] Jones v. Barnes, 463 U.S. 745 (1983). This is true even where the weaker arguments have merit. Id. at 751-2.
>
> When the claim of ineffective assistance of appellate counsel is based on failure to raise the issue on appeal, the prejudice prong of the Strickland test requires the petitioner to establish that the appellate court would have granted relief, had the issue been raised. United States v. Phillips, 210 F.3d 345, 350 (5 Cir. 2000).
>
> As this court noted in denying this claim back in 2008, the burden of proof in an application for post-conviction relief rests entirely with the petitioner. LSA-C.Cr.P. art. 930.2. The petitioner has failed to meet his heavy burden of establishing ineffective assistance of counsel on appeal. He has proven neither deficient performance nor prejudice. Without the establishment of ineffective assistance of counsel, he cannot blame his failure to raise issues on appellate counsel.
>
> Contrary to the petitioner's continuing complaints, this court finds that counsel on appeal was highly effective and diligent. The defendant was represented on appeal by experienced appellate advocate who skillfully raised appellate issues. The fact that the Court of Appeal upheld the jury's verdict does not equate to a finding of deficient performance by appellate counsel.
>
> This claim has no merit.[169]

---

[167] State Rec., Vol. 26 of 72, Order dated June 5, 2008, pp. 3-4.
[168] Cambre v. Cain, No. 08-KH-1153 (La. App. 5th Cir. Mar. 3, 2009); State Rec., Vol. 63 of 72.
[169] State Rec., Vol. 61 of 72, Order dated January 9, 2020, pp. 2-3.

Although that January 9 ruling was likewise subsequently vacated as premature by the Louisiana Fifth Circuit Court of Appeal,[170] the state district court on remand then again denied relief, stating that the "Application for Post-Conviction Relief is again **DENIED**, and the Court's Order, findings, and reasons dated January 9, 2020 readopted as the order of the court."[171]

Thereafter, in denying petitioner's related writ application, the Louisiana Fifth Circuit Court of Appeal noted that although petitioner "asserts in his writ application that the trial court erred by denying all of his APCR claims," he did not "brief the issues or present any argument or questions of law" regarding this claim and "did not specify why the trial court's rulings on [this] claim [was] incorrect." Nonetheless, the Court of Appeal noted that it had reviewed the pleadings and rulings and found "no error" in those rulings.[172]

When petitioner then sought further review by filing a related writ application with the Louisiana Supreme Court, that court stated simply: "Denied. Applicant shows no lower court error."[173]

The standards under which this federal court must review such a claim are clear:

> For [a petitioner's] [ineffective assistance of counsel ("IAC")] claim concerning appellate counsel, the applicable "clearly established Federal law as determined by the Supreme Court of the United States" – against which to measure the state court's decision – is found in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (interpreting Sixth Amendment right to counsel). *E.g.*, Smith v. Robbins, 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) (applying Strickland to IAC claim concerning appellate counsel). To succeed in state habeas court on his IAC claim, pursuant to the "clearly established Federal law" found in Strickland, [the petitioner] was required to show …: (1) appellate counsel's performance was deficient; *and* (2) this performance resulted in prejudice. Strickland, 466 U.S. at 687, 104 S.Ct. 2052.

---

[170] Cambre v. Cain, No. 20-KH-108 (La. App. 5th Cir. May 13, 2020); State Rec., Vol. 64 of 72.
[171] State Rec., Vol. 61 of 72, Order dated August 20, 2020.
[172] Cambre v. Cain, No. 20-KH-382, pp. 2-3 (La. App. 5th Cir. Jan. 12, 2021); State Rec., Vol. 65 of 72.
[173] Cambre v. Cain, 331 So. 3d 916 (La. 2022); State Rec., Vol. 72 of 72.

It bears repeating that the test for federal habeas purposes is *not* whether [the petitioner] made that showing. Instead, the test is whether the state court's decision – that [the petitioner] did *not* make the <u>Strickland</u>-showing – was contrary to, or an unreasonable application of, the standards, provided by the clearly established federal law (<u>Strickland</u>), for succeeding on his IAC claim. Of course, in reaching [a] decision, [the federal court] must consider the underlying <u>Strickland</u> standards.

<u>Schaetzle v. Cockrell</u>, 343 F.3d 440, 443-44 (5th Cir. 2003); <u>see also</u> <u>Harper v. Lumpkin</u>, 19 F.4th 771, 784 (5th Cir. 2021) ("Applying AEDPA deference to <u>Strickland</u>'s already deferential standard, we must deny relief if there is any reasonable argument that appellate counsel satisfied <u>Strickland</u>'s deferential standard despite failing to make the argument in question. In other words, we must deny relief if there was a reasonable justification for the state court's decision." (quotation marks and brackets omitted)).

Regarding those underlying <u>Strickland</u> standards, the United States Fifth Circuit Court of Appeals continued:

For the IAC claim, in state habeas court, both <u>Strickland</u> prongs [have] to be satisfied: deficient performance and prejudice. In order for [a] state habeas court to [find] deficient performance, [the petitioner's] appellate counsel had to have been objectively unreasonable in failing to present the [particular] issue. <u>Robbins</u>, 528 U.S. at 285, 120 S.Ct. 746. "Judicial scrutiny of counsel's performance [is] highly deferential." <u>Strickland</u>, 466 U.S. at 689, 104 S.Ct. 2052. There is a strong presumption that counsel's actions are reasonable; accordingly, counsel's conduct is evaluated from her perspective at the time of appeal. <u>Id.</u>

Counsel need not raise every nonfrivolous ground of appeal, but should instead present "[s]olid, meritorious arguments based on directly controlling precedent". <u>United States v. Williamson</u>, 183 F.3d 458, 463 (5th Cir. 1999).

Such directly controlling precedent is rare. Often, factual differences will make authority easily distinguishable, whether persuasively or not. In such cases, it is not necessarily providing ineffective assistance of counsel to fail to construct an argument that may or may not succeed. But failure to raise a discrete, purely legal issue, where the precedent could not be more pellucid or applicable, denies adequate representation.

<u>Id.</u> at 463 n. 7.

<u>Schaetzle</u>, 343 F.3d at 445.

Moreover, regarding <u>Strickland</u>'s prejudice prong specifically, the Fifth Circuit has explained:

> For the prejudice prong, [the petitioner is] required to show the [state] habeas court there was a reasonable probability that, but for counsel's deficient performance, [the petitioner] would have prevailed on direct appeal. <u>Robbins</u>, 528 U.S. at 285, 120 S.Ct. 746. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694, 104 S.Ct. 2052. Thus, a court must determine the probable outcome of the appeal had counsel's performance not been deficient. <u>Williamson</u>, 183 F.3d at 463.

<u>Schaetzle</u>, 343 F.3d at 448.

As noted in the original Report and Recommendation, the flaw with respect to petitioner's contention that appellate counsel was ineffective for failing to request that the recorded portions of the voir dire proceeding be transcribed is that he fails to specifically allege that anything occurred during those portions of voir dire that would have supported a nonfrivolous appellate claim. Therefore, without more, there is simply no basis for a finding that those transcripts were needed or would have in any way affected the outcome of the appeal. Because nothing in either petitioner's Objections to Magistrate's Report and Recommendation and Incorporated Memorandum[174] or his Traverse and Reply to State's Response in Opposition to Granting Writ of Habeas Corpus[175] remedies the foregoing defect, no further discussion of this contention is necessary or warranted.

---

[174] <u>See</u> Rec. Doc. 22, pp. 27-28.
[175] <u>See</u> Rec. Doc. 22-1, p. 20.

It must be noted that petitioner originally contended that his appellate counsel was also ineffective for failing to assert a claim that the trial court erroneously admitted a statement by Loren Acosta concerning other crimes – a statement that the Court of Appeal had already found was admissible in ruling on a pretrial writ.  In the original Report and Recommendation, the undersigned found that appellate counsel was not ineffective for failing to relitigate an argument that had already been deemed meritless.  In his Objections to Magistrate's Report and Recommendation and Incorporated Memorandum, petitioner conceded that finding was correct and stated:  "Magistrate van Meerveld correctly found that it would have been futile for appellate counsel to re-raise the claim of other crimes evidence that had already been rejected by the appellate court, and thus Cambre wishes to abandon this part of his claim."[176]  Therefore, this part of his original claim should be deemed abandoned, and no further discussion of it is required.[177]

### 4.  Prosecutorial Misconduct[178]

Petitioner also claims that the prosecutor engaged in misconduct.  Specifically, petitioner contends that the prosecutor may have withheld information concerning the discovery of shell casings, in violation of Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.  He contends that the prosecutor also may have violated Napue v. Illinois, 360 U.S. 264 (1959), by allowing false testimony to go uncorrected.

In its ruling in the post-conviction proceedings on January 9, 2020, the state district court expressly addressed and denied that claim, holding:

---

[176] Rec. Doc. 22, p. 28.
[177] In any event, if petitioner changes his mind in any objections he files to this Supplemental Report and Recommendation and requests that the contention be considered, the contention has no merit for the reasons explained in detail in the original Report and Recommendation.  See Rec. Doc. 19, pp. 72-73.
[178] Rec. Doc. 3-1, pp. 59-66.

As the state points out, the defendant raised this issue previously. The court, as requested, reissues its previous finding in regard to this claim.

The petitioner complains that the prosecutor withheld exculpatory information from the defense. In order to prove a Brady[FN 2] violation has occurred, a criminal defendant must establish that (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issues at trial. Notably, "evidence is considered material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[FN 3]

[FN 2] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[FN 3] United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).

In connection with his Brady claim, the petitioner specifically argues that an evidentiary hearing will now be required to determine *if* defense counsel was provided with a draft of the report of the state's firearm expert, Captain Timothy Scanlan.[FN 4] The petitioner state that this report is exculpatory in that it reveals that two casings were discovered following the initial investigation. He states that there is no notation in the court record that this draft report was disclosed to the defense.

[FN 4] Timothy Scanlan has been qualified as an expert in at least seven other reported cases: State v. Johnson, 957 So.2d 833, 06-859 (La.App. 5 Cir. 4/11/07); State v. Davis, 947 So.2d 48, 06-402 (La.App. 5 Cir. 11/28/06); State v. Laviolette, 943 So.2d 527, 06-92 (La.App. 5 Cir. 9/26/06); State v. Dobbins, 920 So.2d 278, 05-342 (La.App. 5 Cir. 12/27/05); State v. Parker, 901 So.2d 513, 04-1017 (La.App. 5 Cir. 3/29/05); State v. Swain, 900 So.2d 82, 04-1001 (La.App. 5 Cir. 3/1/05); and State v. Robicheaux, 865 So.2d 149, 03-1063 (La.App. 5 Cir. 12/30/03).

The petitioner's Brady claim fails for a number of reasons. The court notes at the outset that the witness in question was qualified as an expert and his report was admitted during trial as State's Exhibit #232 in globo on March 9, 2005. The court also notes that the burden of proof is entirely on the petitioner in an application for post-conviction relief. LSA-C.Cr.P. art. 930.2. The court is not required to comb through the multi-volume record or transcript to determine whether this document was produced or the facts disclosed. Furthermore, the legal conclusion that the report contains exculpatory evidence is unwarranted. The crime scene and its interpretation were at issue at trial, not the date the evidence was discovered. It is also significant that the petitioner does not allege that date he received this report. Finally, the petitioner never states when he received this report.

This claim of prosecutorial misconduct by withholding evidence is unsupported by the record and the court will deny relief.

The state also requests, in an abundance of caution, that this court address a previous <u>Napue</u> claim from the petitioner.  In summary, the petitioner invokes <u>Napue</u>[FN 5] for the proposition that where a prosecutor allows a state witness to give false testimony without correction, a reviewing court must reverse the conviction if the witness's testimony reasonably could have affected the jury's verdict, even if the testimony goes only to the credibility of the witness.  <u>Id.</u>, 360 U.S. at 269, 79 S.Ct. 1173.

[FN 5]  <u>Napue v. Illinois</u>, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

The arguments that the state permitted expert witnesses to testify falsely are entirely speculative.  The petitioner's claims do not approach meeting the requirement that the state knowingly allow false testimony.
This claim has no merit.[179]

Although that January 9 ruling was subsequently vacated by the Louisiana Fifth Circuit Court of Appeal on the grounds that the ruling was premature because the state district court had not ruled on other motions petitioner filed with his post-conviction application,[180] the state district court on remand denied the other motions and then expressly stated that the "Application for Post-Conviction Relief is again **DENIED**, and the Court's Order, findings, and reasons dated January 9, 2020 readopted as the order of the court."[181]

In denying petitioner's related writ application, the Louisiana Fifth Circuit Court of Appeal then held:

In his writ application, relator challenges the trial court's denial of his claim of prosecutorial misconduct in violation of <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which was set forth in claim four of his APCR.[FN 2]  He asserts that the State failed to produce exculpatory evidence regarding the date some of the shell casings were discovered in this case.  He states that the record from the trial of his co-defendant contains a draft report with the notes of the State's scientific expert, Captain Scanlan, referred to as, "Notes: Draft Copy."  Relator claims that this report indicates that two of the shell casings were not discovered until the day after the initial collection of evidence on the day of the shooting, and thus, they could have been moved by "post-attack activity" before

---

[179] State Rec., Vol. 61 of 72, Order dated January 9, 2020, pp. 3-4.
[180] <u>Cambre v. Cain</u>, No. 20-KH-108 (La. App. 5th Cir. May 13, 2020); State Rec., Vol. 64 of 72.
[181] State Rec., Vol. 61 of 72, Order dated August 20, 2020.

they were discovered.  Relator contends that the information in the draft report was important to his claim of self-defense, but it was not provided to the defense or included in Captain Scanlan's final report.

> [FN 2]  In the fourth claim of his APCR, relator also claimed that there was a Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) violation, because he State "deliberately lead the witness to provide a sequencing of shots when Scanlan had previously testified that he could not provide such a sequence." However, relator does not address his Napue claim in this writ application.

In Brady v. Maryland, *supra*, the United States Supreme Court held that the suppression by the State of evidence favorable to the accused after it receives a request for such evidence violates a defendant's due process rights where the evidence is material to either guilt or punishment, without regard to the good or bad faith of the prosecutors.  State v. Bright, 02-2793 (La. 5/25/04), 875 So.2d 37, 41. The duty to disclose is applicable even where there has been no request by the accused.  United States v. Agurs, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976).  The State's due process duty to disclose applies to both exculpatory and impeachment evidence.  See United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); State v. Kemp, 00-2228 (La. 10/15/02), 828 So.2d 540, 545.

In order to prove that a Brady violation has occurred, a criminal defendant must establish that:  1) the prosecution suppressed evidence; 2) the evidence was favorable to the defendant; and 3) the evidence was material to the issues at trial. State v. Brown, 15-2001 (La. 2/19/16), 184 So.3d 1265, 1266, (*citing* Strickler v. Greene, 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).  Evidence is material only if there is a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed to the defense.  State v. Calloway, 97-796 (La. App. 5 Cir. 8/25/98), 718 So.2d 559, 562-563, writ denied, 98-2435 (La. 1/8/99), 734 So.2d 1229.  A "reasonable probability" has been interpreted to be a probability sufficient to undermine confidence in the outcome of the trial.  Id.  (*citing* U.S. v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).

In an application for post-conviction relief, the petitioner bears the burden of proving he is entitled to the relief he seeks.  La. C.Cr.P. art. 930.2.  In this case, relator has failed to show that he can meet his burden of proving that there was a Brady violation in this matter.  There is a question of fact as to whether the draft report was disclosed to the defense or not.  However, even if relator could show that this evidence was not disclosed, he has failed to show that this evidence was material to the issues at trial.  Accordingly, we find no error in the trial court's ruling summarily denying relator's claim of prosecutorial misconduct.[182]

---

[182] Cambre v. Cain, No. 20-KH-382, pp. 4-6 (La. App. 5th Cir. Jan. 12, 2021); State Rec., Vol. 65 of 72.

When petitioner then sought further review by filing a related writ application with the Louisiana Supreme Court, that court stated simply: "Denied. Applicant shows no lower court error."[183]

Petitioner thereafter reasserted the prosecutorial misconduct claim in this federal proceeding, and, for the following reasons, it should again be denied.

With respect to <u>Brady</u> claims, the United States Supreme Court has held:

> A <u>Brady</u> violation occurs when the government fails to disclose evidence materially favorable to the accused. This Court has held that the <u>Brady</u> duty extends to impeachment evidence as well as exculpatory evidence, and <u>Brady</u> suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor.

<u>Youngblood v. West Virginia</u>, 547 U.S. 867, 869-70 (2006) (internal citations and quotation marks omitted). Therefore, to prevail on a <u>Brady</u> claim, a petitioner "**must show** that **(1) the state withheld evidence,** (2) the evidence was favorable to the accused, and (3) the evidence is material to guilt or punishment." <u>DiLosa v. Cain</u>, 279 F.3d 259, 262-63 (5th Cir. 2002) (emphasis added). Here, petitioner's claim fails at the very first step of that required analysis.

The supposed <u>Brady</u> material in question in this case is a draft of Scanlan's report entitled "Notes: Draft Copy."[184] However, as noted in the original Report and Recommendation, petitioner candidly admits that **he does not know** whether that report was provided to the defense.[185] But to establish that there was a <u>Brady</u> violation, **he must prove that the report was withheld**. Where, as here, a petitioner presents no evidence whatsoever that the purported <u>Brady</u> material was in fact withheld from the defense, his claim fails at the initial prong of the <u>Brady</u>

---

[183] <u>Cambre v. Cain</u>, 331 So. 3d 916 (La. 2022); State Rec., Vol. 72 of 72.
[184] Several copies of that report are included in the state court record. For example, a copy can be found in Volume 42.
[185] <u>See</u> Rec. Doc. 3-1, p. 59.

inquiry. <u>Williams v. Cain</u>, Nos. 06-0224 and 06-0344, 2009 WL 1269282, at *5 (E.D. La. May 7, 2009), <u>aff'd</u>, 359 F. App'x 462 (5th Cir. 2009); <u>Watson v. Cain</u>, Civ. Action No. 06-613, 2007 WL 1455978, at *7 (E.D. La. May 17, 2007); <u>Harris v. United States</u>, 9 F. Supp. 2d 246, 275 (S.D.N.Y. 1998) ("[T]he government does not bear the burden of establishing that documents were not withheld; it is [petitioner's] burden to prove that the government failed to disclose evidence favorable to [him]."), <u>aff'd</u>, 216 F.3d 1072 (2nd Cir. 2000).

The undersigned is, of course, aware that petitioner contends that he is entitled to an evidentiary hearing to explore the issue of whether the report was in fact withheld. He is wrong. As the United States Supreme Court recently explained:

> AEDPA … restricts the ability of a federal habeas court to develop and consider new evidence. Review of factual determinations under [28 U.S.C.] § 2254(d)(2) is expressly limited to "the evidence presented in the State court proceeding." And in <u>Cullen v. Pinholster</u>, 563 U.S. 170, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011), we explained that review of legal claims under [28 U.S.C.] § 2254(d)(1) is also "limited to the record that was before the state court." <u>Id.</u>, at 181, 131 S.Ct. 1388. This ensures that the "state trial on the merits" is the "main event, so to speak, rather than a tryout on the road for what will later be the determinative federal habeas hearing." <u>Wainwright v. Sykes</u>, 433 U.S. 72, 90, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (internal quotation marks omitted).
>
> If a prisoner "failed to develop the factual basis of a claim in State court proceedings," a federal court may admit new evidence, but only in two quite limited situations. [28 U.S.C.] § 2254(e)(2). Either the claim must rely on a "new" and "previously unavailable" "rule of constitutional law" made retroactively applicable by this Court, or it must rely on "a factual predicate that could not have been previously discovered through the exercise of due diligence." § 2254(e)(2)(A). And even if a prisoner can satisfy one of those two exceptions, he must also show that the desired evidence would demonstrate, "by clear and convincing evidence," that "no reasonable factfinder" would have convicted him of the charged crime. § 2254(e)(2)(B). Thus, although state prisoners may occasionally submit new evidence in federal court, "AEDPA's statutory scheme is designed to strongly discourage them from doing so." <u>Pinholster</u>, 563 U.S. at 186, 131 S.Ct. 1388; see also [<u>Williams v. Taylor</u>, 529 U.S. 420, 437, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) (<u>Michael Williams</u>)] ("Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.").

We have explained that a federal court, in deciding whether to grant an evidentiary hearing or "otherwise consider new evidence" under § 2254(e)(2), must first take into account these restrictions. Shinn v. Martinez Ramirez, 596 U. S. —, —, 142 S.Ct. 1718, 1739, — L.Ed.2d — (2022); see also [Schriro v. Landrigan, 550 U.S. 465, 474, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007)]. The reasons for this are familiar. A federal court "may never needlessly prolong a habeas case, particularly given the essential need to promote the finality of state convictions," so a court must, before facilitating the development of new evidence, determine that it could be legally considered in the prisoner's case. Shinn, 596 U. S., at —, 142 S.Ct., at 1739 (internal quotation marks and citation omitted); see also Bracy v. Gramley, 520 U.S. 899, 904, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997) ("A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course."). If § 2254(e)(2) applies and the prisoner cannot satisfy its "stringent requirements," Michael Williams, 529 U.S. at 433, 120 S.Ct. 1479, holding an evidentiary hearing or otherwise expanding the state-court record would "prolong federal habeas proceedings with no purpose," Shinn, 596 U. S., at —, 142 S.Ct., at 1739 (internal quotation marks omitted). And that would in turn disturb the "State's significant interest in repose for concluded litigation." [Harrington v. Richter, 562 U.S. 86, 103, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011).] A court therefore must, consistent with AEDPA, determine at the outset whether the new evidence sought could be lawfully considered.

Shoop v. Twyford, 142 S. Ct. 2037, 2043-44 (2022). In this case, petitioner does not even argue, much less establish, that he can overcome the restrictions of 28 U.S.C. § 2254(e)(2), and so he has not established the requirements for the Court to hold an evidentiary hearing.

Therefore, this Court must review petitioner's Brady claim using the standards set forth in § 2254(d)(1),[186] which, as already noted *supra*, is limited to the record that was before the state courts. As the United States Supreme Court has explained:

**[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.** Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time *i.e.,* the record before the state court.

---

[186] "Because Brady claims involve mixed questions of law and fact, § 2254(d)(1) … is applied." Floyd v. Vannoy, 894 F.3d 143, 161 (5th Cir. 2018).

… The federal habeas scheme leaves primary responsibility with the state courts. Section 2254(b) requires that prisoners must ordinarily exhaust state remedies before filing for federal habeas relief. It would be contrary to that purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively *de novo.*

… **Our cases emphasize that review under § 2254(d)(1) focuses on what a state court knew and did.** State-court decisions are measured against this Court's precedents as of the time the state court renders its decision. To determine whether a particular decision is "contrary to" then-established law, a federal court must consider whether the decision applies a rule that contradicts such law and how the decision confronts the set of facts that were before the state court. If the state-court decision identifies the correct governing legal principle in existence at the time, a federal court must assess whether the decision unreasonably applies that principle to the facts of the prisoner's case. **It would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court.**

Cullen v. Pinholster, 563 U.S. 170, 181-83 (2011) (emphasis added; footnote, citations, quotation marks, ellipsis, and brackets omitted); accord Blue v. Thaler, 665 F.3d 647, 656 (5th Cir. 2011) ("Pinholster prohibits a federal court from using evidence that is introduced for the first time at a federal-court evidentiary hearing as the basis for concluding that a state court's adjudication is not entitled to deference under § 2254(d).").

For all of these reasons, the original Report and Recommendation concluded that (1) petitioner was not entitled to a federal evidentiary hearing on the issue of whether Scanlan's "Notes: Draft Copy" was suppressed, (2) this Court's review on his Brady claim was therefore limited to the record before the state courts when they denied his claim, and (3) the state court decision denying his claim was not unreasonable given that he failed to present any evidence that the draft report was in fact suppressed. Because nothing in either petitioner's Objections to Magistrate's Report and Recommendation and Incorporated Memorandum[187] or his Traverse and

---

[187] See Rec. Doc. 22, pp. 28-29.

Reply to State's Response in Opposition to Granting Writ of Habeas Corpus[188] remedies that defect, no further discussion of the <u>Brady</u> claim is necessary or warranted.

Petitioner also contended that his rights were violated because the prosecutor allowed false testimony to go uncorrected, but that contention fares no better. It is true that due process may be violated if a prosecutor knowingly presents false testimony at trial or allows untrue testimony to go uncorrected. <u>Giglio v. United States</u>, 405 U.S. 150, 153 (1972); <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959). However, in order to prevail on such a claim, a petitioner "must show 1) the testimony was actually false, 2) the state knew it was false, and 3) the testimony was material." <u>Canales v. Stephens</u>, 765 F.3d 551, 573 (5th Cir. 2014) (quotation marks omitted); <u>accord</u> <u>Devoe v. Davis</u>, 717 F. App'x 419, 426 (5th Cir. 2018).

Here, petitioner contended that Scanlan falsely indicated on redirect examination that he was able to conclude the sequence in which Mr. Marrione's five shots were fired. But, as already explained in detail *supra*, petitioner's contention is based on a misinterpretation of Scanlan's testimony.[189] Therefore, it has not been established that Scanlan's testimony was false, and so there was nothing for the prosecutor to correct. As a result, the original Report and Recommendation concluded that petitioner's contention necessarily failed. Nothing in either petitioner's Objections to Magistrate's Report and Recommendation and Incorporated Memorandum[190] or his Traverse and Reply to State's Response in Opposition to Granting Writ of Habeas Corpus[191] warrants reconsideration of that conclusion.

---

[188] <u>See</u> Rec. Doc. 22-1, p. 21.
[189] <u>See</u> *supra* pages 64-65.
[190] <u>See</u> Rec. Doc. 22, pp. 29-30.
[191] <u>See</u> Rec. Doc. 22-1, pp. 21-22.

However, both the Objections and the Traverse raise a contention that should be addressed. For example, in his Objections he argues:

> Another <u>Napue</u> violation occurred when the State's expert Scanlan testified at the Logan trial that he knew nothing about Connie Fossier's statement that she had only heard two sequences of shots, without any difference in sound. Cambre has shown that: (1) the witnesses statements at trial regarding the sequence of shots she heard were false as they were materially different than her original statements to the police when the issue was fresh in her mind, (2) the prosecution had to have known the statements were false because the prosecution was in possession of her original statements and was aware that her statements at trial were materially different, (3) the statements were material because her original statements favored Cambre's version of events while her later changed trial testimony favored the State.[192]

This essentially mirrored an argument also made in the Traverse.[193]

It is unclear whether the foregoing is arguing Scanlan lied, Fossier lied, or both. However, regardless, the allegation appears to be premised on petitioner's contention that Fossier's original statement was materially inconsistent with her testimony – and that contention has already been discussed and rejected *supra*.[194]

Stated simply, petitioner has not established that **either** Scanlan **or** Fossier's testimony contained a material falsehood. Accordingly, relief is not warranted under <u>Napue</u>.

Lastly, petitioner suggests that an evidentiary hearing should also be held to further explore his "false testimony" claims.[195] However, for the reasons already explained herein and in the original Report and Recommendation, an evidentiary hearing is not available or appropriate in this case.

### 5.  Cumulative Error[196]

---

[192] Rec. Doc. 22, pp. 29-30.
[193] <u>See</u> Rec. Doc. 22-1, p. 22.
[194] <u>See</u> *supra* page 34.
[195] Rec. Doc. 3-1, p. 65.
[196] <u>Id.</u> at pp. 66-67.

Lastly, petitioner claims that he is entitled to relief based on the cumulative effect of the errors in his case.  In its ruling in the post-conviction proceedings on January 9, 2020, the state district court expressly addressed and denied that claim, holding:

> The defendant repeats his cumulative error claim.  This court emphatically rejected this claim in the 2008 order.  The same law and reasoning apply.
> The petitioner argues that the total aggregate effect of errors denied him a fair trial.  When, as here, the individual contentions are meritless, the result cannot be change simply by asserting them collectively.[FN 6]  The United States Fifth Circuit Court of Appeals rejected cumulative error, stating:  "Twenty times zero equals zero."[FN 7]
> More important than the federal Fifth Circuit's skepticism of the cumulative error argument is the doctrine's rejection by the Louisiana Supreme Court.  That Court has held that "the combined effect of the incidences complained of, none of which amounts to reversible error [does] not deprive the defendant of his right to a fair trial."[FN 8]

> [FN 6] United States v. Hall, 455 F.3d 508, 520 (5th Cir. 2006), cert. denied, 127 S.Ct. 2029 (2007); Miller v. Johnson, 200 F.3d 274, 286 n. 6 (5th Cir. 2000).
> [FN 7]  Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir. 1987).
> [FN 8]  State v. Copeland, 530 So.2d 526, 544-545 (La. 1988), cert. denied, 489 U.S. 1091, 109 S.Ct, 1558, 103 L.Ed.2d 860 (1989), quoting State v. Graham, 422 So.2d 123, 137 (La. 1982), appeal dismissed, 461 U.S. 950, 103 S.Ct. 2419, 77 L.Ed.2d 1309 (1983).[197]

Although that January 9 ruling was subsequently vacated by the Louisiana Fifth Circuit Court of Appeal on the grounds that the ruling was premature because the state district court had not ruled on other motions petitioner filed with his post-conviction application,[198] the state district court on remand denied the other motions and then expressly stated that the "Application for Post-Conviction Relief is again **DENIED**, and the Court's Order, findings, and reasons dated January 9, 2020 readopted as the order of the court."[199]  Petitioner's related writ applications were then

---

[197] State Rec., Vol. 61 of 72, Order dated January 9, 2020, p. 4.
[198] Cambre v. Cain, No. 20-KH-108 (La. App. 5th Cir. May 13, 2020); State Rec., Vol. 64 of 72.
[199] State Rec., Vol. 61 of 72, Order dated August 20, 2020.

likewise denied on the merits by both the Louisiana Fifth Circuit Court of Appeal[200] and the Louisiana Supreme Court,[201] again without the claim being specifically addressed.

As noted in the original Report and Recommendation, this claim merits little discussion. For the reasons already explained in detail *supra*, petitioner has failed to establish that **any** errors of constitutional dimension were committed in his case. And where no such errors have been established, there is nothing to cumulate and so the cumulative error doctrine simply has no applicability. Murphy v. Davis, 901 F.3d 578, 599 (5th Cir. 2018); Turner v. Quarterman, 481 F.3d 292, 301 (5th Cir. 2007) ("[A]s this court has stated explicitly, where individual allegations of error are not of constitutional stature or are not errors, there is nothing to cumulate." (quotation marks omitted)); Westley v. Johnson, 83 F.3d 714, 726 (5th Cir. 1996) ("Meritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised."); Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir. 1987) ("Twenty times zero equals zero.").

Reconsideration of this issue is not warranted. Nothing in petitioner's Traverse and Reply to State's Response in Opposition to Granting Writ of Habeas Corpus addresses the general rule that the cumulative error doctrine is inapplicable where there are no errors of constitutional dimension to cumulate.[202] And although petitioner expresses his disagreement with that general rule in his Objections to Magistrate's Report and Recommendation and Incorporated Memorandum,[203] this Court is bound by the foregoing Circuit precedent.

### D.  Evidentiary Hearing

---

[200] Cambre v. Cain, No. 20-KH-382 (La. App. 5th Cir. Jan. 12, 2021); State Rec., Vol. 65 of 72.
[201] Cambre v. Cain, 331 So. 3d 916 (La. 2022); State Rec., Vol. 72 of 72.
[202] See Rec. Doc. 22-1, p. 22.
[203] See Rec. Doc. 22, pp. 30-32.

Lastly, the Court notes that petitioner ends both his Objections to Magistrate's Report and Recommendation and Incorporated Memorandum[204] and his Traverse and Reply to State's Response in Opposition to Granting Writ of Habeas Corpus[205] with an argument that he is entitled to a federal evidentiary hearing on his claims.  Therefore, out of an abundance of caution, the undersigned will again address that argument.

Simply put:  the argument is foreclosed by binding precedent.  To concisely reiterate once again what has already been explained in detail *supra*:  Petitioner's claims were denied by the state courts on the merits, and they must be reviewed by this federal court under the deferential standards of review mandated in 28 U.S.C. § 2254(d)(1).  "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  Cullen v. Pinholster, 563 U.S. 170, 181 (2011). "Pinholster prohibits a federal court from using evidence that is introduced for the first time at a federal-court evidentiary hearing as the basis for concluding that a state court's adjudication is not entitled to deference under § 2254(d)."  Blue v. Thaler, 665 F.3d 647, 656 (5th Cir. 2011).

## RECOMMENDATION

It is therefore **RECOMMENDED** that Mark T. Cambre's petition for habeas corpus relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from

---

[204] See id. at 32- 35.
[205] See Rec. Doc. 22-1, pp. 22-26.

attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[206]

New Orleans, Louisiana, this ___26th___ day of July, 2023.

JANIS VAN MEERVELD
UNITED STATES MAGISTRATE JUDGE

---

[206] Douglass referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.